UNITED STATES (LILIENTHAL'S TOBACCO v.). See Case No. 16,106a.

## Case No. 15,600.

UNITED STATES v. The LILLA et al.

[2 Cliff. 169.] [1]

Circuit Court, D. Massachusetts. May Term, 1863.[2]

APPEAL—PRIZE CASE—FURTHER PROOF—NEUTRAL OWNERS—BONA FIDES.

1. In a prize court, where the motion for further proof was filed in the court below, and was there overruled, and the appeal taken, as well from the action of the court in that behalf as from the decree upon the merits, *held*, that the appellate tribunal would not grant a separate hearing, upon the motion, because the appeal is an entirety, and the several questions involved in it can be most conveniently heard at the same time.

2. Where such motion was made and overruled in the court below, it cannot be determined whether the action of the court was correct or incorrect, without recurring to the evidence then before the court.

3. If the neutral owner claims a portion of the cargo, which belongs to an enemy, for the purpose of deceiving the court, the rule is that the part belonging to the neutral will be condemned, as a penalty for the fraudulent conduct; but this rule, perhaps, should only be applied in extreme cases, and where the evidence leaves no doubt of the truth of the charge, and the circumstances afford no ground of justification, palliation, or excuse.

4. The universal rule is, that, before a claimant can expect an order for further proof to be made, he must be able to render it probable, that if the motion is granted, he will be able to overcome the probative force of the suspicious circumstances.

5. A purchase of an enemy's vessel in a neutral port, during war, is itself a suspicious cir-

1 [Reported by William Henry Clifford, Esq., and here reprinted by permission.]
2 [Affirming Case No. 8,348.]

cumstance; and whenever such a purchase is drawn in question, the evidence of an absolute and bona fide transfer ought to be clearly established.

6. Neutrals may purchase an enemy's ship, but such purchases are liable to great suspicion; and if full proof be not given of their validity, by bill of sale and payment of a valuable consideration, it will materially impair the validity of the neutral claim.

7. Evidence to acquit or condemn must come, in the first instance, from the papers of the officers and crew of a captured ship, and leave for further proof is granted in cases of honest mistake or ignorance, or to clear doubts or remedy defects, but the application must be supported by evidence of probable cause and good faith, or it will be rejected

8. Prize courts will not, in general, grant an order for further proof, where it clearly appears that the party moving for the order has knowingly attempted to cover and claim an enemy's interest in the captured property, whether the purpose of the claimant was to protect his own interest, or to benefit the enemy owner.

9. Persons claiming to be the owners of property captured as prize, and wishing to procure the restitution of the same, must file their claim before the proper court. The master or agent may make the claim, but it must be made in behalf of the proper party; and if no claim at all be made, the presumption is that it is enemy's property, and the same must finally be condemned.

10. Claims presented after the proofs have been opened and examined, and after hearing the reasons assigned for the condemnation, are never favored.

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a case of prize, and the case came before the court upon an appeal from a decree of the district court [Case No. 8,-348]. Capture was made on the 3d of July, 1862, by the United States gunboat Quaker City; and the vessel and her cargo were sent into this district for adjudication. The property captured was the brig Lilla and her cargo; and the material allegation of the libel was that the vessel and her cargo were lawful prize to the United States and to her captors. Claim for the vessel was filed July 30, 1862, by Barak Maxwell, of Wells, in the state of Maine. He intervened for his interest, and that of Richard C. Bartlett, and the Mercantile Mutual Insurance Company. His claim was for the vessel, her tackle, apparel, and furniture, and he alleged that he and the parties for whom he intervened were the true and lawful owners of the vessel. A part of her cargo was sold by agreement. On the 2d of August, 1862, Charles Applebee appeared and also filed a claim to the brig, her tackle, apparel, and furniture, as the property of Richard G. Bushby, a British subject. According to his statement, he also was a British subject; and the allegation was that he filed the claim as the master who was in command of the vessel during the voyage. Among other things, he alleged, that she was a British merchant brig, duly register-

ed as such, and that she was wholly owned by British subjects. Allegation was also made upon information and belief, that all of the cargo, except thirty-seven packages of medicine, was owned by British subjects, residing and being in England at the time of the capture and the filing of the claim. Said packages of medicine, as alleged, belonged to a passenger, but the name of the passenger was not specified, nor did the intervenor in direct terms make any claim for that part of the cargo. Three days later, the name of the passenger was given in a test affidavit filed by the claimant, as B. D. Hewetson, and it was then represented that he was also a British subject, and that he was the owner of the thirty-seven packages of medicine. The claimant intervened as master; and the allegation was that all of the cargo, except the packages of medicine, was owned by Bushby & Co. of Liverpool; and he averred "that the parties aforesaid were the bona fide owners of said brig and cargo," and denied that the same were lawful prize. Proofs in preparatorio were duly taken, and filed in the cause, consisting of the depositions of all who were on board at the time of the capture. On the 1st of October, 1862, the proctor for the claimants of the vessel and cargo, moved the court for an order for further proof in the cause, to enable him to establish the truth of the alleged fact that R. G. Bushby was the true and lawful owner of the vessel; and that the cargo was shipped from the port of departure to be transported to Nassau, and nowhere else, and that the shippers, John Senior & Co., Bushby & Co., R. G. Bushby, I. Perrin & Co., and Henry Lafone were and always had been the bona fide shippers and owners of the cargo in the proportion standing in their names on the freight-lists on file; that they, the claimants, were British subjects; and that Barry D. Hewetson, also a British subject, was the owner of the several packages of medicine, and that no part of the cargo was intended to be transported to any Southern port, in violation of any blockade or belligerent right of the United States.

Full hearing was had in the district court, and the motion for further proof was denied and overruled. Final decree was accordingly entered on the 14th of October, 1862, to the effect, that the claim of R. G. Bushby to the vessel should be dismissed, and that the claim of Barak Maxwell and others to the same should be allowed; but, inasmuch as it appeared, that the vessel had previously been taken from their possession, by the officers and crew of an armed vessel acting as a privateer, under the direction and control of the enemies of the United States, and was captured from the possession of persons claiming title under such pretence of authority, the restoration of the vessel to them was ordered, on the condition that they should pay to the captors a certain sum as

salvage, and the costs and expenses of the captors incurred on account of the vessel. A part of the cargo was found to be the property of Barry D. Hewetson, although not formally claimed by him; and in respect to that part of the claim the decree was, that it be condemned as lawful prize, upon the ground that the owner had for a long time been a resident in Charleston, S. C., which was a part of the territory of the enemies of the United States, and the property must, therefore, be deemed the property of an enemy. The residue of the cargo was claimed in behalf of R. G. Bushby and others, and was condemned· by this decree. The ground of the decree was that the claimants were not the real owners of the property, but that the apparent title thereto was for the benefit of persons permanently residing in the territory of the enemies of the United States, and was simulated for the purpose of deceiving the cruisers of the United States; and also because it appeared, that the property so claimed was the property of persons permanently residing in the territory of such enemies, and consequently must be deemed to be enemies' property. Appeal was duly claimed by R. G. Bushby as owner of the vessel, and by Bushby & Co., as part-owners of the cargo.

The application for the order for further proof contains an allegation, that portions of the cargo were owned by John Senior & Co., R. G. Bushby, I. Perrin & Co., Henry Lafone, and Barry D. Hewetson; and they were also joined in the petition for an appeal. It was in evidence that the vessel was built in Wells, in the state of Maine, and that she was owned by the American claimants; her permanent enrolment showed that she was built at that port in the year 1855, and that she was called the Betsey Ames, of Wells, and that Richard P. Bartlett, one of the American claimants, was at that time her maste·. The enrolment was dated on the 31st of October in that year, but on the 30th of March following, the same was surrendered at the custom-house in Boston, and cancelled, and a temporary register was taken out, in which it was certified that the vessel was bound on a foreign voyage; the owners' oath was duly taken on both these occasions, and the corresponding certificates were issued that the American claimants were the only owners of the vessel. Barak Maxwell's test affidavit affirmed the same thing, and also stated, that about the 1st of October, 1862, the vessel sailed from New York for Cuba with a lawful cargo. The evidence also tended to show that during the voyage, somewhere about the 12th of October, she was captured by an armed vessel commanded by one Henry L. Libby, acting or claiming to act under the assumed authority of the so-called Confederate States; that she was carried into Charleston, S. C., and while lying there, by proceedings in a tribunal of some kind, she was condemned and sold. John Frazer & Co., a commercial house doing business in the city of Charleston, were the purchasers. Immediately after the proceedings for condemnation, the name was changed to ine Mary Wright; and under this new name, November 2, 1862, she successfully run the blockade established by the United States, still commanded by the same Henry L. Libby, and she arrived at Liverpool under the same commander, some time in the following month, where she was soon after registered as the British brig Lilla, in ·the name of the claimant Bushby. On the 15th of May following she sailed from Liverpool on a voyage, which was the subject of investigation in this cause.

R. H. Dana, Jr., U. S. Dist. Atty.

The title of Bushby is not shown to be bona fide. The onus is on him to show his title and neutrality. 1 Wheat. [14 U. S.] 506 (Append.); The Walsingham Packet, 2 C. Rob. Adm. 77; The Rosalie & Betty, Id. 343; The Countess of Lauderdale, 4 C. Rob. Adm. 283. The vessel may be condemned, notwithstanding the owners have a neutral as well as an enemy domicile. The San Jose Indiano [Case No. 12,322]; The Antonio Johanna, 1 Wheat. [14 U. S.] 159; The Friendship, 4 Wheat. [17 U. S.] 105. The fraud as to the master is attempted to be imposed upon ·the prize court. This is not merely a fraud as to the master, but it shows that there was reason to conceal that Libby was master. There were false bills of lading of the medicine; they were made out in Bushby's name, but Hewetson was the owner of them. This fact alone would warrant the dismissal of the claim of R. G. Bushby to the vessel. The St. Nicholas, 1 Wheat. [14 U. S.] 431; The Betsey [Case No. 1,364]; The Graaf Bernstorf, 3 C. Rob. Adm. 109; The Eenrom, 2 C. Rob. Adm. 1; Dos Hermanos, 2 Wheat. [15 U. S.] 76.

The purchase of an enemy's vessel in a neutral port during war is suspicious. 2 Wheat. [15 U. S.] 30 (Append.); Hall, Law War, 483; 3 Phillim. Int. Law, § 486; The Dree Gebroeder, 4 C. Rob. Adm. 233; The Argo, 1 C. Rob. Adm. 159; The Bernon, Id. 102; The Welvaart, Id. 122. When such a purchase is so made,·the evidence of absolute and bona fide transfer of all interest must be clear. Retaining the former master, an enemy, in command, taking an enemy passenger, with a cargo belonging to him, and bound to an enemy's blockaded port, and making no change in the vessel or her employment, are all circumstances of grave suspicion relied on by the courts.

The claim of Bushby & Co. ought to be dismissed. The cargo must be presumed to be enemies' property, from the fact that it was in an enemy's vessel. The London Packet, 5 Wheat. [18 U. S.] 132; The Flying Fish [Case No. 4,892]; The Primus, 29 Eng. Law & Eq. 590. A fortiori, where there is an attempt to conceal the character of the vessel, where

the enemy master is continued in command, his true character concealed, and where the vessel is bound on just such a voyage as an enemy charterer would have prosecuted. The London Packet [Case No. 8,474]. As part of this cargo was certainly enemies' property, and bound to an enemy's port, the maxim noscitur a sociis applies. One of the claimants has concealed the character of the vessel. The Eenrom, 2 C. Rob. Adm. 1; The Graaf Bernstorf, 3 C. Rob. Adm. 109; The Betsey [supra]. If this cargo, neutral when shipped, was to become enemy's property in the event of safe arrival, it should be condemned. The Ann Green [Case No. 414]; The Francis [Id. 5,032].

The motion for further proof should be refused, because it offers no proof of facts essential to be shown, or to explain the difficulties. The Vrouw Hermina, 1 C. Rob. Adm. 163; The St. Lawrence, 8 Cranch [12 U. S.] 442; The Mars, 6 C. Rob. Adm. 86. It was filed after seeing the proof, and hearing the reasons for condemnation. 3 Phillim. Int. Law, § 467, and cases cited supra.

S. Bartlett and C. G. Thomas, for British claimants.

The vital question as to the vessel is, whether the evidence in preparatorio is such as ought to induce the court, to refuse the claimant all right, to establish as against the captors, by further proof, the existence and fairness of his title, and that such title is not held in trust for enemies, on the ground of which suspected trust alone, the condemnation in the court below rested. It is fit, at the outset, to find on what grounds the supreme court place the doctrine of admission or rejection of further proof, since its rules of decision have been less austere than those of some of the earlier cases in the circuit courts. It is well settled, if an application for further proof be rejected in the district court, this court can administer the proper relief. The Pizarro, 2 Wheat. [15 U. S.] 240.

The doctrine of the supreme court, in relation to further proof is best stated in the following cases: The Dos Hermanos, 2 Wheat. [15 U. S.] 80 where it is stated thus: "If from the whole evidence the property clearly appeared to be hostile or neutral, condemnation or acquittal immediately follows. If, on the other hand, the property appear doubtful, or the case be clouded with suspicions or inconsistencies, it then becomes a case of further proof. It is granted in cases of honest mistake or ignorance, or to clear away any doubts or defects consistent with good faith. But if the parties had been guilty of gross fraud, or misconduct, or illegality, further proof is not allowed." In the case of The Fortuna, Id. 161; where papers were concealed in a tin box in an old piece of timber, and where it was insisted that such fraudulent concealment was a substantial ground for condemnation, the court sustained an application for further proof. In the case of The Pizarro, Id. 228; where papers were thrown overboard, and where it was insisted that such spoliation of papers excluded the benefit of further proof, the court held it to be a circumstance open to explanation, and not a ground for denial of further proof. In the case of The Friendschaft, 3 Wheat. [16 U. S.] 47; where it was contended that, in a case of cargo accompanied by mere bills of lading, but not with letter of advices or invoices, claimants ought not to be let into further proof, the court refused so to regard it, stating (page 48) "that it is unquestionably extraordinary that the same vessel which carries the goods should not also carry invoices and letters of advice, but the inference which the counsel for the captors would draw from this fact does not seem to be warranted by it. It might induce a suspicion that papers had been thrown overboard, but in the total absence of evidence that the fact had occurred, the court would not be justified in coming positively to such a conclusion. Between London and Lisbon, where the voyage is short and the packets regular, the bills of lading and invoices might be sent by the regular conveyances." The case of The Atalanta, Id. 409, was a case where property clearly neutral was shipped on board an armed enemies' vessel, which it was contended was conclusive ground of condemnation; but the court held that the claimant should be entitled to make further proof, although there were other facts that weighed against him, stating thus (pages 415, 416): "In addition to the extraordinary fact of employing a belligerent carrier, while a neutral vessel belonging to the alleged owner of the cargo lay in port, there are circumstances in this case calculated to awaken suspicion, which the claimant ought to clear up so far as may be in his power."

Was this case when heard by the district judge, and before the application for further proof, one where the property "clearly appeared to be hostile," or was it a case where "since the property appeared doubtful, and the case clouded by suspicions or inconsistencies, it then became a case of further proof"; and if it fell within the latter category, had the claimant "been guilty of gross fraud or misconduct," which upon settled principles shut him off from further proof? If parties, through misapprehension, have not been represented in the case, they may file their case even after it has reached the supreme court. The Harrison, 1 Wheat. [14 U. S.] 298. Barak Maxwell, in presenting only a register of enrolment of the vessel, does not show even prima facie evidence of title. The title of Maxwell must be proved in the ordinary way in which title is established. The rules of proof in prize cases do not permit property to be delivered to any party who shall make a claim to it supported by his test affidavit or oath; even in uncontested cases, no court of admiralty would deliver up a vessel to a party under such slender proof of title. The London Packet, 2 Wheat. [15 U. S.] 371.

F. C. Loring, for Maxwell and American claimants.

By the decree of the district court, this vessel was ordered to be restored to these claimants, its former owners, on payment of a certain sum as salvage to the officers and crew of the Quaker City, and costs. From this decree neither the libellants nor these claimants have appealed; consequently, so far as the libellants are concerned, they cannot now contest the right of these claimants to restitution, nor ask a larger amount of salvage than that awarded by the district court. The claimants ar equally concluded by its decree, and cannot now insist that no salvage or a smaller amount should be awarded. The Mary Ford, 3 Dall. [3 U. S.] 188; Stratton v. Jarvis, 8 Pet. [33 U. S.] 4. The American claimants are bound to show their original title and ownership; it is proved by the test affidavit of Barak Maxwell, and the shown identity of the Lilla with the Mary Wright and the Betscy Ames.

The Confederate cruiser had no right by the law of nations to make captures. She was a private-armed vessel. Chit. Law Nat. 73; The Estrella, 4 Wheat. [17 U. S.] 298. Until the government of the United States shall recognize the Confederate States as an independent power, its courts cannot do so. That is a political, and not a judicial question, over which courts of law have no jurisdiction. Rose v. Himely, 4 Cranch [8 U. S.] 241; U. S. v. Palmer, 3 Wheat. [16 U. S.] 610; The Nueva Anna, 6 Wheat. [19 U. S.] 193; Judge Sprague's Charge, 24 Law Rep. 17. The British claimants' title depends not only upon the legality of the capture, but of the proceedings and sentence of condemnation. There were no such judicial proceedings for condemnation of the vessel as this court could recognize. Rose v. Himely, 4 Cranch [8 U. S.] 241. Consequently, the ownership of the American claimants was not disturbed by the alleged capture or condemnation. The facts of the case tend to show that Bushby was a colorable, and not a real purchaser of the vessel. There is necessity of condemnation to change title. The Flad Oyen, 1 C. Rob. Adm. 135; The Kierlighett, 3 C. Rob. Adm. 97; Goss v. Withers, 2 Burrows, 683; Assievedo v. Cambridge, 10 Mod. 77; Chit. Law Nat. 99, 100; Hall. Law Nat. 728.

CLIFFORD, Circuit Justice. The petition or motion for appeal is signed by the proctor of the claimants, and the only entry under it in the transcript is, that "the court allowed an appeal accordingly," which is, to say the least of it, exceedingly indefinite, and not very satisfactory.

Strong doubts are entertained whether any of the parties named, except R. G. Bushby and Bushby & Co., had any right to appeal; but as no motion to dismiss is presented, the court will briefly examine the whole case.

The parties appealed from the refusal of the court to grant the motion for an order for further proof, as well as from the decree dismissing the claim to the vessel, and condemning the cargo as lawful prize. The appellants hardly contend that the decree of the district court was incorrect upon the proofs there exhibited, but they insist that the court plainly erred in overruling the motion for an order for further proof.

Prize courts of original jurisdiction usually, and almost necessarily, hear the cause in the first instance upon the proofs taken in preparatorio, and then decide upon that evidence, whether or not it is proper to allow such a motion if one be filed. Where the motion was filed in the court below and was therein overruled, and the appeal is taken, as well from the action of the court in that behalf, as from the decree upon the merits, the appellate tribunal will seldom or never grant a separate hearing upon the motion, because the appeal is an entirety, and the several questions involved in it can be most conveniently and appropriately heard at the same time.

Such motions may also be originally made in the appellate court, and where they are so made, the hearing upon the question of granting the same may in the same manner be deferred, and the motion heard with the merits; or in special cases, where, upon opening the record, it appears that the application for leave may conveniently and safely be heard and determined, without a full examination of the entire merits; or where it clearly appears that delay will be prevented and justice promoted, the court will hear the application as a preliminary motion in the cause, and grant or refuse it as the circumstances of the case may require. The present case is one where the motion was filed and overruled in the court below, and of course it is one where it cannot be determined whether the action of the court was correct or incorrect, without recurring to the evidence then before the court. The original owners of the vessel insist, in the first place, that the British claimant is a mere nominal purchaser; that the beneficial interest, if any was acquired under the pretended condemnation and sale, is still in the purchasers at that sale, and that if the claimant took or now holds the legal title, it was and is, only as trustee for the equitable owners, who in truth and fact were and continue to be enemies of the United States. Secondly, they contend that even if the British claimant was an actual purchaser for value, still that their claim as original owners of the vessel must prevail, because the evidence shows that the primary title held by them has never been diverted. The last proposition is chiefly one of law, but the first presents a mixed question of law and fact, and of course must depend in a great measure upon the evidence. The theory of the British claimant is that he is the bona fide owner of the vessel, under a purchase for value, in an open market,

from one holding the legal title; and that the voyage was in fact, as described in the ship's papers, a voyage from Liverpool to Nassau and back, and nowhere else; and that the cargo was neutral property, destined unconditionally and without any reserve, for the Nassau market, as a lawful traffic between two neutral ports. Assuming the facts to be so, then it is clear that the owners of the cargo had nothing to conceal, and it may be, that in the proper application of those liberal principles which ought always to prevail in favor of neutral rights, that the claim to the vessel. if the purchaser had no knowledge or notice actual or constructive, of the infirmity of the title, is one which a prize court ought to respect and protect; but in the view taken of the case, it will not be necessary to decide or even to examine that question at the present time, for the reason, that it is obvious that unless all the conditions, mentioned as applicable to the claim for the vessel, substantially concur, the view of the claimant upon that branch of the controversy cannot be sustained. The ship's papers represent that Charles Applebee was the master for the voyage, and he appeared in the case as such, and preferred the claim both to the vessel and to the cargo, and the only one that has been filed, except that presented by the original owners of the vessel. When interrogated as a witness in the preparatory examination, he testified that R. G. Bushby owned the vessel as he supposed, and that the supposed owner appointed him master. The evidence shows that he acted as master in loading the vessel, in shipping the crew, in signing the ship's papers, and in navigating the vessel out of the harbor of the port of departure. The sixteenth answer of the witness was to the effect that he had no acquaintance with any of the shippers, and knew nothing as to the ownership of the cargo. Subsequently, however, he stated that the medicines belonged to a passenger, and that Mr. Libby was a passenger, but that he (Libby) had no interest in the vessel or cargo.

Hearing was had upon the evidence taken in preparatorio before the motion for an order for further proof was filed. Accompanying that motion is an affidavit signed by the witness, which was filed at the same time with the motion. He there states that before he sailed he knew nothing of Henry Libby, except that he was introduced to him by the claimant of the brig, to go as a passenger in the vessel to Nassau, but he admits that after the vessel got to sea, he learned by his conversation that the supposed passenger commanded the vessel on the outward passage. Captors insisted at the hearing that Henry S. Libby was in point of fact the master of the vessel for the voyage. Witnesses examined in preparatorio so testified, and their depositions were duly filed in the cause. Special reference is made to the deposition of the acting mate as establishing

that fact. He testified that Henry S. Libby acted as master, working the ship and giving the courses from the time they left Liverpool, until they sighted the Quaker City; and he also stated that he heard the affiant say, that he was to act as mate until they got to Nassau, and that Libby was then to leave, and that he was to take the vessel back to the port of departure. Libby, as the witness states, was really "my skipper on the voyage, and Applebee and I stood watches like first and second mates." An attempt was made by the affiant, when he gave his affidavit in support of the motion for an order for further proof, to break the force of that testimony, but the attempted explanation is not satisfactory. He admits that he stood watch on the voyage, but alleges that he had done so for many years, when he had no second mate, and was in the command of a small vessel. The interference of Libby in the command of the vessel is admitted, but he alleges that it was the controversy growing out of that interference that induced him to make the entry on the log-slate. The presumption from the whole evidence is irresistible that Henry S. Libby, who had first captured the vessel, and then successfully employed her in running the blockade, and finally navigated her to the port of Liverpool, was in point of fact the actual master on the return voyage. The clearance was doubtless facilitated, and perhaps inquiry silenced, by putting forward the mate as the ostensible master; and it is equally probable that the arrangement contemplated that he was to resume the position as master, whenever it should become necessary for him to do so, as a means of deceiving the cruisers of the United States, in case any attempt should be made to board the vessel. The claimant of the vessel knew Henry S. Libby, and the clear inference from all the evidence is that he was connusant of the whole arrangement. All of the cargo as represented in the claim was the property of Bushby & Co., except thirty-seven packages of medicines, and those it was stated belonged to a passenger. The preparatory proofs showed that the name of that passenger was Barry D. Hewetson; and the bills of lading show, that all the medicines and other goods constituting his adventure, were shipped in the name of the claimant of the vessel. The bill of lading is made to order or to assigns, but it is not indorsed, nor was the shipment accompanied by any instructions. The owner of that part of the cargo, although a British subject, is shown beyond peradventure to have been a permanent resident in the city of Charleston, and to have been in the vessel during the outward voyage, both when she ran the blockade, and when she arrived at the port of destination. His own testimony shows that he owned the merchandise, and that he shipped the same for the shop of his son-in-law, also a permanent resident in Charleston, and doing business there as a druggist;

and he expressly stated that he was "interested with him" in the trade or business. The application for the order for further proof alleges, that the party named was the bona fide owner of the goods, and that no part of the cargo was intended for a Southern port; but the proctor presenting it offers no evidence to prove the allegations, except the affidavit of the owner and shipper of the merchandise. Studied effort is made by him to qualify the testimony he gave before the commissioners, but the explanations are not of a character to obviate the force and effect of his former statements. Insufficient and unsatisfactory as they are, however, still they deserve, and should receive, a brief notice. Respecting the relations between him and his son-in-law in regard to the packages of medicines, he says that he did not mean to testify that he was interested with him in the profits of his store, but only that he was interested with him as being his son-in-law, which is a distinction, as it seems to the court, more ingenious than credible. The witness stated before the commissioners that he had his own bills of lading in his trunk, but he did not produce anything of the kind. Failing to exhibit them, the commissioners showed him the one found on board the vessel, and he admitted that the two sets of initials appearing in the margin of the paper were his own, and those of the firm of his son-in-law, but he stated that he did not know the claimant of the vessel, or how the bills of lading came to be made in his name, or to his order. The explanation upon that subject, if such it may be called, is, that he received his bills of lading from the ostensible master, and he repeats in his affidavit that he has them in his possession, and is ready to exhibit them to the court; but they have never been produced.

Taken as a whole, the evidence on this branch of the case shows that the party owning the medicines was domiciliated in the enemy's country; that he had a permanent residence there, and that he purchased and shipped the property intending to transmit it there, and that he was in the act of so doing when the capture was made. The conclusion, therefore, is inevitable, that the name of the claimant of the vessel was used to cover enemies' property, and, unlike the owner of the thirty-seven packages of medicine, he does not even offer the excuse that he was ignorant of the transaction. Where the neutral owner claims another part of the cargo which belongs to an enemy, for the purpose of deceiving the court, the rule is as laid down by the supreme court, in the case of The St. Nicholas, 1 Wheat. [14 U. S.] 417, that the part belonging to the neutral will be condemned as a penalty for the fraudulent conduct. Doubts are entertained whether that rule ought to be applied except in extreme cases, where the evidence leaves no doubt of the truth of the charge, and the circumstances afford no ground of justification, palliation, or excuse. But the case under consideration presents no necessity for the decision of that question, as the evidence upon that subject must be taken in connection with the undeniable proof of deception practised as to the master, and the whole list of subterfuges, cropping out in every part of the transaction, from the date of the register of the vessel, to the time of her capture. Freight was not paid to the claimant of the vessel by the owner of the medicines, and he carefully omits to state to whom he paid it. If he is to be believed, he paid it in advance, but to whom he paid it he does not state. His language is, "the freight was paid in advance, they would not take it on any other terms," but the names of the persons to whom the payment was made do not appear. The evidence shows that he applied to Frazer, Trenholme & Co. for his passage and for transportation of the medicines, and they finally directed him to send the same to the Lilla, and he obeyed their instructions. They had to inquire, however, of another "gentleman" before they could decide to take the freight, but the case is silent as to the name of the person of whom the inquiries were made. What relation Frazer, Trenholme & Co. bear to John Frazer & Co. does not directly appear, and the claimants offer no explanation upon the subject. The outward cargo was consigned by the one of those parties to the other; and the witness Henry S. Libby states that the former were the agents of the Charleston house, and they still appeared as the managing owners of the vessel after the pretended sale to the present claimant.

Subterfuge and fraud, as to the bills of lading, and as to the master, are not the only imputations of the kind which are justified by the evidence. On the contrary, the deception as to the master is carried out in all the official papers, connected with the manning, victualling, loading, clearing, and sailing of the vessel, and the same subterfuges and misrepresentation are adopted in the claim and attempted to be imposed upon the court. Many other circumstances might also be adverted to, as tending to establish the same conclusion. The ostensible master was directed to report himself to a certain commercial house at Nassau, and to confer with them as to the disposition of the cargo, but the same brief letter also states that instructions were to follow by mail, showing conclusively that the letter was not regarded as the letter of instructions. Just enough was written to apprize the persons to whom the communication was addressed, that secret instructions were forthcoming, and to make it useful to the ostensible master, in case he found it necessary to use it as a means to elude capture in the course of the voyage. The Flying Fish [Case No. 4,892].

The motion for the order requested and refused, is supported by the affidavit of the proctor, and by the affidavits of the osten-

sible master, and the owner and shipper of the medicines, and of George D. Harris, one of the firm to whom the before-mentioned letter was addressed. The vessel on her voyage from Charleston to Liverpool was consigned to Frazer, Trenholme & Co., and that commercial house, or one of the partners, acted as the agents of John Frazer & Co. in the pretended sale to the claimant. The shipping articles also show that the Liverpool house are still the managing owners of the vessel, and the evidence also shows, that they paid the advance wages of the seamen, and that the return list of the crew was without date and directed to their firm. None of these matters are explained or proposed to be explained, in any other way than by the suggestion that they are not necessarily conclusive. The answer to that suggestion is, that the burden is upon the claimant to explain the suspicious parts of the transaction The universal rule is that before a claimant can expect an order for further proof to be made, he must be able to render it probable that if the motion is granted, he will be able to overcome the probative force of the suspicious circumstances. The affidavits accompanying the motion do not constitute a compliance with that rule. As a whole, they are sufficient in form, but they are wanting in substance. They affirm that the vessel was regularly documented to the claimant, and that she was really bound to Nassau, and not to any Southern port, but they do not show that the claimant paid value for the vessel, or that he held the title as his own absolutely, and not in trust for enemies of the United States.

No attempt is made to explain why two masters were on board, nor the deception, as to the one who in fact had the command, and no effort is made to explain the suspicions arising out of the character of the official papers. Direct testimony is also exhibited in the record which requires explanation. The deponent, Gleason, testifies, that Frazer, Trenholme & Co., of Liverpool and Charleston, owned the vessel and her cargo when she was taken by the Quaker City, and that the two houses have the same name in each of those places, and that they owned her before she sailed on the outward voyage. The same witness also testifies, that he heard Henry S. Libby say that the cargo was to have been carried from Nassau to Charleston in the steamer Scotia, which was to follow the Lilla to Nassau, and there to take the cargo, and the informant of the witness, on board for Charleston. The argument is that the witness is not entitled to credit, but where there is such a cloud of suspicion hanging over a transaction, such suggestions are not alone sufficient answer to the imputations.

The purchase of an enemy's vessel in a neutral port during war, and while active hostilities are waging, is itself a suspicious circumstance, and whenever such a purchase is drawn in question, the evidence of an absolute and bona fide transfer ought to be clearly established. Neutrals may purchase an enemy ship, but such purchases are liable to great suspicion, and if good proof be not given of their validity, by bill of sale and payment of a valuable consideration, it will materially impair the validity of the neutral claim. 2 Wheat. [15 U. S.] 30 (Append.); Wheat. Int. Law (by Lawrence) 972; The Bernon, 1 C. Rob. Adm. 102; The Dree Gebroeders, 4 C. Rob. Adm. 232.

Further proof, says Mr. Phillimore, is never allowed to the claimants where fraudulent papers have been used, where there has been a spoliation of papers, where there has been a fraudulent covering or suppression of an enemies' interest, where there is a false destination and false papers, nor, in general, where the case appears incapable of fair explanation, or where there has been gross prevarication, or an attempt to impose spurious claims upon the court, or such want of good faith as shows that the parties cannot safely be trusted with such an order. The Welvaart, 1 C. Rob. Adm. 122; The Rising Sun, 2 C. Rob. Adm. 104; The Graaf Bernstorf, 3 C. Rob. Adm. 109; The Nancy, Id., 122; The Vrouw Hermina, 1 C. Rob. Adm. 163.

Evidence to acquit or condemn, must come in the first instance from the papers and officers and crew of the captured ship. The captors are to bring the ship's papers into the registry of the district court, in order that the principal officers and seamen of the captured ship may be examined, and their examinations reduced to writing under the rules of the court. The cause is to be heard, in the first instance, upon those papers and the depositions so taken; and if it clearly appear that the property is that of an enemy, or neutral, condemnation or restitution immediately follows; or if it appear that the character of the property is doubtful or the case suspicious, the order for further proof may be granted, according to the rules which govern the legal discretion of the court, but further proof will not be allowed if it appear that the claimants have been guilty of gross fraud or misconduct or illegality. Leave for further proof is granted in cases of honest mistake or ignorance, or to clear away doubts or defects, but the application for it must be supported by evidence of probable cause and good faith, or it will be rejected. The Dos Hermanos, 2 Wheat. [15 U. S.] 76.

Such is the substance of certain general rules laid down by the supreme court, to which it may be added, that prize courts will not in general grant an order for further proof where it clearly appears that the party moving the order has knowingly attempted to cover and claim an enemy's interest in the captured property, whether the purpose of the claim was to promote his own interest or to benefit the enemy owner. The Betsy [Case No. 1,364].

Applying these rules to the present case, I

am of the opinion that the motion for the order for further proof was properly overruled, and that the decree of the district court directing the vessel to be restored to the American claimants was correct.

Neither the libellants nor the American claimants appealed, and of course the allowance for salvage must remain unchanged. An appeal was also regularly taken by R. G. Bushby & Co., as claimants of all the cargo, except the thirty-seven packages of medicine. The documents found on board the vessel, tending to show the ownership of the cargo, are the bills of lading and freight-list.

Two parcels of saltpetre, one of seven hundred and two bags, and the other of six hundred and thirty-four bags, were shipped in the name of the claimant, and the bills of lading purport to have been consigned to order. The bills of lading were found for each of the two parcels of saltpetre, and they contain the firm name of Bushby & Co. as the shippers of that part of the cargo, and it appears that at some time they had been indorsed, but the indorsement is erased by a line drawn through it. The freight-lists and bills of lading also show that John Senior and Co., R. G. Bushby, J. Perrin & Co., and Henry Lafone were shippers of certain portions of the cargo, and there is no evidence whatever which in any manner tends to show that the claimants owned, or pretended to own, those portions of the cargo, except the unsupported statement of the claim.

The affidavit of the proctor states that the other shippers, naming them, have ever been and still are the bona fide shippers and owners of the several portions of the cargo standing in the freight-list on file. Gross error or wilful falsity is stamped upon all that part of the claim. Even the proctor does not pretend that any of the other shippers, except Barry D. Hewetson, have ever filed any claim, or attempted to furnish any evidence to show that the merchandise ought to be returned. Persons claiming to be owners of property captured as prize, and wishing to procure the restitution of the same, must file their claim for such property before the proper court. The master or agent may make the claim, but it must be made in the name of the proper party; and if no claim at all be made, the presumption is that it is enemy property, and the same must finally be condemned. 3 Phillim. Int. Law, § 466, p. 442; 1 Wheat. [14 U. S.] 499, note.

The enemy proprietor is necessarily absent by operation of law, and yet the sentence is completely valid, as well against him as against all the world. The Falcon, 6 C. Rob. Adm. 199.

Nine of the bills of lading are in favor of the shippers, who, it is conceded, have made no claim, and there yet is as much reason to suppose that they were owners, as that the claimants owned the goods shipped in their name. Some of the bills of lading were indorsed in blank and others were not, but it does not appear to whom any of them were consigned. The other shippers make no claim, and no attempt is made to procure their testimony or to furnish any explanation upon the subject. Four of the bills of lading were in favor of R. G. Bushby, the claimant of the vessel, and yet he says he owned no part of the cargo, and that he acted only as ship-owner. He it is who wrote the only letter that accompanied the cargo, and now he disclaims all interest in the adventure, except as ship-owner. The claimants, or one of their firm introduced Henry S. Libby to the ostensible master, and must have had full knowledge of all the principal circumstances attending the manning, loading, victualling, and sailing of the vessel. All of these circumstances have been very carefully considered in determining upon the validity of the claim to the vessel, and the remarks there made upon the evidence need not be repeated. An order for further proof in respect to the cargo was also moved by these claimants, but it is very clear that it was properly overruled. The proposition in effect now is, to show that the claim as originally made is not true; that large portions of the cargo were owned, not by the claimants, but by other persons, who have never made any claim or taken any steps to show that the capture was unlawful. The suspicious circumstances tending to implicate the owners of the cargo are not explained or attempted to be explained, and without such explanation there is no pretence that the motion ought to be granted. The examination of the case thus far has been confined to the questions involved in the appeal, and the result is that there is no error in the record. Since the appeal, however, a new claim has been presented in this court, and the motion is, to allow the petitioners to take further testimony to support the claim. The new claim is in behalf of Fraser, Trenholme & Co., and it is presented by her Britannic majesty's consul. Through him, the parties named move for the order, for further proof in the cause to enable them, among other things, to show that the goods and merchandise described in the prior claim to the cargo belonged to them, and that the same were shipped by the prior claimants as their agents. Nothing of the kind was suggested in the prior claim, although it is signed by the ostensible master, who must have been well known to the managing owners of the vessel. They do not sign the claim, and it is not accompanied by any test affidavit signed by them. The libel was filed on the 14th of July, 1862, but the new claim was not presented until the 5th of June of the present year. In the mean time the cause had been heard, determined, appealed, and the opinion of the district judge delivered, published, and circulated.

The cause was heard, not only upon its merits, but also upon motions for an order for further proof, both in respect to the vessel and the cargo. The parties preferring this

claim were silent throughout all that period, and they admit that the prior claimants were their agents in shipping the goods and merchandise, and they do not in terms deny that they were their agents in presenting and prosecuting the claim. Unless it can be held that the new claim is one in aid of the prior claim, and consistent with it, the general rule is that it must be rejected as an attempt after the decree of the prize court to contradict the claim upon which the decision was founded. On the other hand, if it be regarded as a claim in aid of the prior one, and consistent with it, then it is wholly unnecessary, and should be rejected as an unusual proceeding.

Agents may present a claim as well as principals, and as the prior claimants were the agents of the petitioners in shipping the goods and merchandise, it is no more than a reasonable presumption, considering the long delay and the facilities for obtaining information, that they were also their agents in prosecuting the claim in the lower court, and in taking the appeal. The rights of all parties would have been concluded if no appeal had been taken, and that was taken by the prior claimants, and of course the petitioners must approve their action in that behalf, else they could have no standing in court. Full proof is exhibited in the cause that the petitioners had knowledge of this enterprise from its commencement. They were the consignees of the vessel on her voyage from Charleston to Liverpool, and they were the agents of John Frazer & Co. in the pretended sale of the vessel. Had the matter stopped there, the present application might have had some foundation, but it does not stop there, because the proof is undeniable that they were the managing owners of the vessel for the voyage, and at the time she was captured. Claims presented after the proofs have been opened and examined, and after hearing the reasons assigned for the condemnation, are never to be favored, and under the circumstances of this case the claim cannot be allowed.

The motion for an order for further proof is overruled, and the decree of the district court condemning the cargo as lawful prize, is affirmed with costs.