THE BENITO ESTENGER.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 192.  Argued January 11, 12, 1900. — Decided March 5, 1900.

The general rule is that in time of war the citizens or subjects of the belligerents are enemies to each other without regard to individual sentiments or dispositions, and that political status determines the question of enemy ownership.

By the law of prize, property engaged in any illegal intercourse with the enemy is deemed enemy property, whether belonging to an ally or a citizen, as the illegal traffic stamps it with the hostile character and attaches to it all the penal consequences.

Provisions are not, in general, deemed contraband; but they may become so if destined for the army or navy of the enemy, or his ports of naval or military equipment.

In dealing with a vessel asserted to be an enemy vessel, the fact of trade with the enemy in supplies necessary for the enemy's forces is of decisive importance.

Individual acts of friendship cannot change political status where there is no open adherence to the opposite cause and former allegiance remains apparently unchanged.

A consul has no authority by reason of his official station to grant exemption from capture to an enemy vessel; and this vessel was not entitled to protection by reason of any engagement with the United States.

In cases of peculiar hardship, or calling for liberal treatment, it is not for the courts, but for another department of the Government, to extend such amelioration as the particular instance may demand.

Transfers of vessels *flagrante bello* cannot be sustained if subjected to any condition by which the vendor retains an interest in the vessel or its profits, a control over it, or a right to its restoration at the close of the war.

The burden of proof in respect of the validity of such transfers is on the claimant, and the court holds as to the transfer in this case that the requirements of the law of prize were not satisfied by the proofs.

THE Benito Estenger was captured by the U. S. S. Hornet on June 27, 1898, off Cape Cruz on the south side of the island of Cuba, and was brought into the port of Key West and duly libelled on July 2. The depositions *in preparatorio* of Badamero Perez, Edwin Cole and Enrique de Messa were taken, and thereafter and on July 27 a claim was interposed by Perez as master of the steamer on behalf of Arthur Elliott Beattie, a British subject, as owner, supported by test affidavits of himself and de Messa. The cause was preliminarily heard on the libel, the depositions *in preparatorio* and the test affidavits, and sixty days given for further proofs. Accordingly the depositions of the claimant and sundry others were taken on behalf of the claimant, and the testimony of the consul of the United States at Kingston on behalf of the captor. The cause coming on for final hearing, the court entered a decree December 7, 1898, condemning the vessel as lawful prize as enemy property, and ordering her to be sold in accordance with law. Claimant thereupon appealed, and assigned errors to the effect in substance that the court erred in failing to hold that the Benito Estenger was a British merchant ship, duly documented and entitled to the protection of the British flag, and lawfully owned and registered by a subject domiciled in Great Britain; and also in holding that the Benito Estenger was lawful prize of war, inasmuch as she was engaged on a voyage in

behalf of the local Cuban junta in Kingston, allies of the United States, and when captured was in the service of the United States, and employed in friendly offices to the forces of the United States. The vessel prior to June 9, 1898, was the property of Enrique de Messa, of the firm of Gallego, de Messa and Company, subjects of Spain and residents of Cuba. On that day a bill of sale was made by de Messa to the claimant, Beattie, a British subject, and, on compliance with the requirements of the British law governing registration, was registered as a British vessel in the port of Kingston, Jamaica. The vessel had been engaged in trading with the island of Cuba, and more particularly between Kingston and Montego, Jamaica, and Manzanillo, Cuba. She left Kingston on the 23d of June, and proceeded with a cargo of flour, rice, cornmeal and coffee to Manzanillo, where the cargo was discharged. She cleared from Manzanillo at 2 o'clock A.M., June 27, for Montego, and then for Kingston, and was captured at half-past five of that day off Cape Cruz. The principal question was as to the ownership of the vessel and the legality of the alleged transfer, but other collateral questions were raised in respect of the alleged Cuban sympathies of de Messa; service on behalf of the Cuban insurgents in the United States; and the relation of the United States consul to the transactions which preceded the seizure. It was argued that the vessels of Cuban insurgents and other adherents could not be deemed property of the enemies of the United States; that this capture could not be sustained on the ground that the vessel was such property; that the conduct of de Messa in his sale to Beattie was lawful, justifiable, and the only means of protecting the vessel as neutral property from Spanish seizure; and finally, that this court could and should do justice by ordering restitution, under all the circumstances of the case.

*Mr. Harrington Putnam* for claimant.

*Mr. Assistant Attorney General Hoyt* for the United States. *Mr. Joseph K. McCammon* and *Mr. James H. Hayden,* counsel for captors, were on his brief.

*Mr. George A. King* and *Mr. William B. King* filed a brief on behalf of captors.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

If the alleged transfer was colorable merely, and Messa was the owner of the vessel at the time of capture, did the District Court err in condemning the Benito Estenger as lawful prize as enemy property?

"Enemy property" is a technical phrase peculiar to prize courts, and depends upon principles of public policy as distinguished from the common law. The general rule is that in war the citizens or subjects of the belligerents are enemies to each other without regard to individual sentiments or dispositions, and that political status determines the question of enemy ownership. And by the law of prize, property engaged in any illegal intercourse with the enemy is deemed enemy property, whether belonging to an ally or a citizen, as the illegal traffic stamps it with the hostile character and attaches to it all the penal consequences. *Prize cases*, 2 Black, 635, 674; *The Sally*, 8 Cranch, 382, 384; *Jecker* v. *Montgomery*, 18 How. 110; *The Peterhoff*, 5 Wall. 28; *The Flying Scud*, 6 Wall. 263.

Messa was a Spanish subject, residing at Santiago, and for years engaged in business there. His vessel had a Spanish crew and Spanish officers, and he testified that he was on board of her as supercargo. She had the Spanish flag in her lockers, though she was flying the British flag at the moment, under a transfer, which, as presently to be seen, was colorable and invalid. There was evidence tending to show that Messa sympathized with the Cuban insurgents, but no proof that he was himself a Cuban rebel or that he had renounced his allegiance to Spain. The vessel carried to Manzanillo on this voyage a cargo of provisions, consisting principally of eleven hundred barrels of flour.

Manzanillo was a city of several thousand inhabitants and the first important place on the south Cuban coast between

Santiago and Cienfuegos, lying inside the bay formed by the promontory which Cape Cruz terminates, and about sixty miles northeast of the cape. Cape Cruz is about due north from Montego Bay on the northwestern shore of Jamaica, and about seventy-five miles distant, while Kingston is on the southeastern coast of Jamaica. The record lacks evidence of the condition of affairs there at that time, but official reports leave no doubt that it was defended by several vessels of war and by shore batteries, and was occupied by some thousands of Spanish soldiers. On the 6th of April, 1898, the Secretary of the Navy had instructed Admiral Sampson, among other things, that the Department desired, "That in case of war, you will maintain a strict blockade of Cuba, particularly the ports of Havana, Matanzas, and, if possible, Santiago de Cuba, Manzanillo and Cienfuegos." Manzanillo was the terminus of a cable which connected with Santa Cruz, Trinidad, Cienfuegos and Havana, and was subsequently cut by the forces of the United States, in order to check the inland traffic with Manzanillo and to prevent the calling of reënforcements to resist the capture of that place. And it appeared that Admiral Sampson had been for some weeks endeavoring to stop blockade running on the south coast of Cuba, and that a large vessel with a heavy battery was stationed at Cape Cruz. Manzanillo was not declared blockaded, however, until the proclamation of June 27, 1898; but the consul of the United States at Kingston had warned Messa and Beattie that a blockade in fact existed. The claimant testified that the vessel was chartered by Flouriache, a Cuban merchant, and that the cargo was consigned to Bauriedel and Company, at Manzanillo. The deposition of neither of these was taken. According to the explicit testimony of the consul, he was informed by both the claimant and his brother that the flour was transferred by Bauriedel and Company, through a communicating way from their warehouse to the Spanish government warehouse, immediately upon its delivery; and no evidence to contradict this was introduced.

The instructions of the Navy Department to "Blockading Vessels and Cruisers," in the late war, included among articles

conditionally contraband, "Provisions, when destined for an enemy's ship or ships, or for a place that is besieged."

In *The Commercen*, 1 Wheat. 382, 388, Mr. Justice Story said : "By the modern law of nations provisions are not, in general, deemed contraband; but they may become so, although the property of a neutral, on account of the particular situation of the war, or on account of their destination. . . . If destined for the ordinary use of life in the enemy's country, they are not, in general, contraband; but it is otherwise if destined for military use. Hence, if destined for the army or navy of the enemy, or for his ports of naval or military equipment, they are deemed contraband."

In *The Jonge Margaretha*, 1 C. Rob. 189, 193, Sir William Scott discussed this question, and, after referring to many instances, concluded: "And I take the modern established rule to be this, that generally they are not contraband, but may become so under circumstances arising out of the particular situation of the war, or the condition of the parties engaged in it."

But while alluding to this subject by way of illustration we do not feel called on to consider under what particular circumstances, generally speaking, provisions may be held contraband of war. It is enough that in dealing with a vessel adjudicated to have been an enemy vessel, the fact of trade with the enemy, especially in supplies necessary for the enemy's forces, is of well nigh decisive importance.

In reply it is suggested that this cargo was intended for the Cuban insurgents, and a quotation is made from a letter of the consul to the effect that he had been " told privately by the president of the local junta, who has performed valuable services for me, that the proceeds of this cargo are to be forwarded to the Cuban government and troops through the Cuban agent at Manzanillo." The suggestion derives no support from the record, and the facts remain that the provisions were delivered to the Spanish government, and that the trade to this Spanish stronghold constituted, under the laws of war, illicit intercourse with the enemy.

This brings us to consider the contention that Messa had

rendered important services to the United States; that he was the friend and not the enemy of this Government, and that there was an agreement between him and the United States consul which operated to protect the vessel from capture. But Messa's status was that of an enemy, as already stated, and this must be held to be so notwithstanding individual acts of friendship, certainly since there was no open adherence to the Cuban cause, and allegiance could have been shifted with the accidents of war. The legal conclusion was not affected by the fact that Messa had, in cultivating friendly relations with the consul, given the latter an old Government plan of the province of Santiago and an especially prepared chart of the harbor. Thus displaying his amicable inclinations, he endeavored to obtain from the consul a letter of protection for the voyage he was about to undertake, but this the consul declined to furnish, and informed him at the same time that Manzanillo was blockaded, and that the contemplated venture would be at his own risk.

Nevertheless, the consul agreed to write the Admiral, and did write him June 23, that Messa offered to give certain information that might be valuable, and that he proposed to be off Cape Cruz on June 30, when he could be picked up there and taken to the Admiral if desired; but the consul said: "You quite understand that in dealing with those people, one is always more or less liable to imposition. I therefore make no recommendation of Messa to you." There was nothing to show that the voyage was undertaken on the strength of this letter or that it in any way contributed to the capture, nor that the Admiral intended to avail himself of the suggestion in regard to Messa.

The claimant asserted and the consul denied that protection to the voyage was extended by the latter. But we do not go at length into this matter because we think that no engagement with the United States nor any particular service to the United States was made out in that connection, and so far as appears the vessel was captured in the ordinary course of cruising duty at a time and under circumstances when her liability was not to be denied. Moreover, a United States

consul has no authority by virtue of his official station to grant any license or permit the exemption of a vessel of an enemy from capture and confiscation. This was so held by Judge Mc Caleb in *Rogers* v. *The Amado*, Newberry, 400, in which he quotes the language of Sir William Scott in *The Hope*, 1 Dodson, 226, 229: "To exempt the property of enemies from the effect of hostilities, is a very high act of sovereign authority; if at any time delegated to persons in a subordinate situation, it must be exercised either by those who have a special commission granted to them for the particular business, and who, in legal language, are termed *mandatories*, or by persons in whom such a power is vested in virtue of any official situation to which it may be considered incidental. It is quite clear that no consul in any country, particularly in an enemy's country, is vested with any such power in virtue of his station. '*Ei rei non præponitur;*' and therefore his acts relating to it are not binding."

In *The Joseph*, 8 Cranch, 451, the vessel was condemned for trading with the enemy, and it was held that she was not excused by the necessity of obtaining funds to pay the expenses of the ship, nor by the opinion of an American minister expressed to the master, that by undertaking the voyage he would violate no law of the United States. The court said that these considerations, "if founded in truth, present a case of peculiar hardship, yet they afford no legal excuse which it is competent to this court to admit as the basis of its decision."

This is equally true of the case before us, for even if the circumstances may have justified liberal treatment, that cannot be permitted to influence our decision. It belongs to another department of the Government to extend such amelioration as appears to be demanded in particular instances.

Neither the case of *Les Cinq Frères*, 4 Lebau's Nouveau Code des Prises, 63, nor that of *The Maria*, 6 C. Rob. 201, cited by counsel, is in point. In the former, the Committee of Public Safety in the year three of the French calendar of the Revolution decreed the condemnation of Les Cinq Frères as an enemy's vessel, and of her cargo although belonging to Frenchmen, but further decreed restitution of the cargo or its

value, as matter of grace, in consideration of services rendered by the claimants in furnishing provisions to the Republic, adding that this should not be drawn into a precedent. The latter simply involved the interpretation of an indulgence specifically granted by the British government.

Thus far we have proceeded on the assumption that the transfer of the Benito Estenger was merely colorable, and this, if so, furnished in itself ground for condemnation. A brief examination of the evidence, in the light of well-settled principles, will show that the assumption is correct.

Messa's story of the transfer was that the steamer had been owned by Gallego, Messa and Company, and then by himself; that he was compelled to sell in order to get money to live on; that he made the sale for $40,000, for which, or a large amount of which, credit was given on an indebtedness of Messa to Beattie and Company, and that he was employed by Beattie to go on the vessel as his representative and business manager.

It appeared that Beattie applied to the customs and shipping office in Jamaica for a British register, lodged with him the bill of sale, and made a declaration of ownership before him as registrar of shipping, which documents were filed on June 9 and 14 respectively, and were in conformity with the requirements of British law. The depositions of the ship broker and his employés put the price at nine thousand pounds, and showed their belief that the sale was *bona fide*, founded on what passed between Messa and Beattie. They did not know what arrangements were made for the payment of the price or how or in what shape the purchase money was paid. The accountant stated that after the sale Beattie went on board and took possession of the vessel, and informed the officers in charge that he had become the owner, gave orders regarding her, and informed witness that he had given Messa the position as supercargo.

There was considerable confusion on the point as to who was master of the vessel after the transfer. Perez testified that he was, and as master he interposed the claim on behalf of Beattie. He also swore that Mr. Beattie "informed him

that he could remain as master, but it would be necessary for him to put an English subject on board as first officer or second captain, in conformity with the British law." Cole, a British subject, asserted that he was master, and Beattie stated that he appointed him such with Perez as mate and pilot, while Messa said that Perez was master and that he, Messa, was supercargo. Perez had been the captain of the ship and remained on her, and conceding that Cole was placed on board in the capacity of captain, the inference is not unreasonable that this was for appearances only.

Beattie testified that he was a member of the firm of Beattie and Company, composed of himself and his brothers, all British subjects, and interested in lands, sugar estates, mines and forests in the district of Manzanillo; that he had resided there for some years, returning to his parents' home in England for several months at a time; that he concluded the purchase of the Benito Estenger from Messa on June 9, 1898; that she left Jamaica on her last voyage on June 23, bound for Manzanillo, and chartered by Flouriache, a Cuban merchant, carrying a cargo of food stuffs sent for the purpose of trade; that he bought the vessel for nine thousand pounds; but he declined to state of what the payment or payments of the purchase money consisted, although saying that the sale was *bona fide.*

The consul testified that claimant, in conversation, while insisting that the transfer was absolute, admitted that it was effected for the purpose of protecting the vessel.

In short, the statements as to price were conflicting; the reason assigned for the sale was to get money to live on, and yet apparently no money passed, and Messa said that he received credit for a large part of the consideration on indebtedness to claimant's firm; claimant himself refused to describe the payment or payments; the Spanish master and crew remained in charge; Messa went on the voyage as supercargo; the vessel continued in trade, which, in this instance at least, appeared to be plainly trade with the enemy; and, finally, it is said by claimant's counsel in his printed brief: "It will not be contended upon this appeal that all the interest of Mr.

Messa in the Benito Estenger ceased on June 9, 1898. The transfer was obviously made to protect the steamer as neutral property from Spanish seizure. That Mr. Messa, however, still retained a beneficial interest after this sale and transfer of flags, and continued to act for the vessel as supercargo, has not been disputed."

The attempt to break the force of this admission by the contention that the change of flag was justifiable as made to avoid capture by the Spanish is no more than a reiteration of the argument that Messa was a Cuban rebel, and his vessel a Cuban vessel, which, as has been seen, we have been unable to concur in. If the transfer were invalid, she belonged to a Spanish subject, she was engaged in an illegal venture, and her owner cannot plead his fear of Spanish aggression.

Transfers of vessels *flagrante bello* were originally held invalid, but the rule has been modified, and is thus given by Mr. Hall, who, after stating that in France "their sale is forbidden, and they are declared to be prize in all cases in which they have been transferred to neutrals after the buyers could have knowledge of the outbreak of the war;" says: "In England and the United States, on the contrary, the right to purchase vessels is in principle admitted, they being in themselves legitimate objects of trade as fully as any other kind of merchandise, but the opportunities of fraud being great, the circumstances attending a sale are severely scrutinized, and the transfer is not held to be good if it is subjected to any condition or even tacit understanding by which the vendor keeps an interest in the vessel or its profits, a control over it, a power of revocation, or a right to its restoration at the conclusion of the war." International Law, (4th ed.) 525. And to the same effect is Mr. Justice Story in his Notes on the Principles and Practice of Prize Courts, (Pratt's ed.) 63; 2 Wheat. App. 30: "In respect to the transfers of enemies' ships during the war, it is certain that purchases of them by neutrals are not, in general, illegal; but such purchases are liable to great suspicion; and if good proof be not given of their validity by a bill of sale and payment of a reasonable consideration, it will materially impair the validity of a neutral

claim; . . . and if after such transfer the ship be employed habitually in the enemy's trade, or under the management of a hostile proprietor, the sale will be deemed merely colorable and collusive. . . . Anything tending to continue the interest of the enemy in the ship vitiates a contract of this description altogether."

*The Sechs Geschwistern*, 4 C. Rob. 100, is cited, in which Sir William Scott said: "This is the case of a ship, asserted to have been purchased of the enemy; a liberty which this country has not denied to neutral merchants, though by the regulation of France, it is entirely forbidden. The rule which this country has been content to apply is, that property so transferred, must be *bona fide* and absolutely transferred ; that there must be a sale divesting the enemy of all further interest in it; and that anything tending to continue his interest, vitiates a contract of this description altogether."

In *The Jemmy*, 4 C. Rob. 31, the same eminent jurist observed: "This case has been admitted to farther proof, owing entirely to the suppression of a circumstance, which if the court had known, it would not have permitted farther proof to have been introduced; namely, that the ship has been left in the trade, and under the management of her former owner. Wherever that fact appears, the court will hold it to be conclusive, because, from the *evidentia rei*, the strongest presumption necessarily arises, that it is merely a covered and pretended transfer. The presumption is so strong, that scarcely any proof can avail against it. It is a rule which the court finds itself under the absolute necessity of maintaining. If the enemy could be permitted to make a transfer of the ship, and yet retain the management of it, as a neutral vessel, it would be impossible for the court to protect itself against frauds."

And in *The Omnibus*, 6 C. Rob. 71, he said: "The court has often had occasion to observe, that where a ship, asserted to have been transferred, is continued under the former agency and in the former habits of trade, not all the swearing in the world will convince it that it is a genuine transaction."

The rule was stated by Judge Cadwalader of the Eastern

District of Pennsylvania thus: "The rule of decision in some countries has been that, as to a vessel, no change of ownership during hostilities can be regarded in a prize court. In the United States, as in England, the strictness of this rule is not observed. But no such change of property is recognized where the disposition and control of a vessel continue in the former agent of her former hostile proprietors; more especially when, as in this case, he is a person whose relations of residence are hostile." *The Island Belle*, 13 Fed. Cases, 168.

So in *The Baltica*, Spinks Prize Cases, 264, several vessels had been sold by a father, an enemy, to his son, a neutral, immediately before the war, and only paid for in part, the remainder to be paid out of the future earnings thereof, and the Baltica, which was one of them, was condemned on the ground of a continuance of the enemy's interest.

In *The Soglasie*, Spinks Prize Cases, 104, Dr. Lushington held the *onus probandi* to be upon the claimant, and made these observations: "With regard to documents of a formal nature, though when well authenticated they are to be duly appreciated, it does not follow that they are always of the greatest weight, because we know, without attributing blame to the authorities under which they issue, they are instruments often procured with extraordinary facility. What the court especially desires is, that testimony which bears less the appearance of formality, — evidence natural to the transaction, but which often carries with it a proof of its own genuineness; the court looks for that correspondence and other evidence which naturally attends the transaction, accompanies it, or follows it, and which, when it bears upon the face of it the aspect of sincerity, will always receive its due weight."

In *The Ernst Merck*, Spinks Prize Cases, 98, the sale was to neutrals of Mecklenburg shortly before the breaking out of war, and it was ruled that the onus of giving satisfactory proof of the sale was on the claimant, and without it the court could not restore even though it was not called on to pronounce affirmatively that the transfer was fictitious and fraudulent. In that case the vessel was condemned partly because of absence of proof of payment, Dr. Lushington saying: "We

all know that one of the most important matters to be estab-lished by a claimant is undoubted proof of payment."

To the point that the burden of proof was on the claimant see also *The Jenny,* 5 Wall. 183; *The Amiable Isabella,* 6 Wheat. 1; *The Lilla,* 2 Cliff. 169; Story's Prize Courts, 26.

We think that the requirements of the law of prize were not satisfied by the proofs in regard to this transfer, and on all the evidence are of opinion that the court below was right in the conclusion at which it arrived. *Decree affirmed.*

Mr. Justice Shiras, Mr. Justice White and Mr. Justice Peckham dissented.