## THE SALLY MAGEE.

1. When a vessel is liable to confiscation, the first presumption is that the cargo is so as well.
2. The *primâ facie* legal effect of a bill of lading, as regards the consignee, is to vest the ownership of the goods consigned by it in him.
3. Ownership thus presumptively in an enemy is not disproved by a test affidavit in prize, stating generally that the goods consigned had been purchased for their consignee contrary to his instructions, and that he had rejected them; and that this appeared " from the correspondence of the parties," which the affiant (an asserted agent of the alleged true owner) swore that he " believed to be true," but which neither he nor any one produced, or accounted for the absence of; and where, though two years had passed between the date of the claim and that of the decree, the consignors and asserted owners, who lived at Rio Janeiro, had not manifested any interest in the result of the prize proceedings, which were at New York, nor, so far as appeared, had been even applied to in the matter.

   [N. B. The court, referring to *The Merrimack* and *The Frances* (8th Cranch, 317 and 354), admitted that the case would be different had the allegation as to purchase by the consignor, in contravention of orders and subsequent rejection by the consignee, been sufficiently proved; and proved affirmatively, as it was requisite to prove it.]

4. A lien on enemy's property, set up under the act of March 3, 1863, to protect the liens of loyal citizens upon vessels and other property which belonged to rebels, is not sufficiently proved by the test-oath of the party setting up the lien and asserting it without any specification as to date of origin, " from correspondence" with the parties and " copies of the invoice of the cargo" sworn to as " believed to be true;" the correspon-

dence and copies not being produced, nor their absence accounted for. The principles asserted in the preceding paragraph of the syllabus apply here.

5. Capture at sea of enemy's property clothes the captors with all the rights of the owner which subsisted at the commencement of the voyage; and anything done thereafter, designed to incumber the property or to change its ownership, is a nullity.

6. Cases of prize are usually heard, in the first instance, upon the papers found on board the vessel, and the examinations taken *in preparatorio;* and it is in the discretion of the court thereupon to make, *suâ sponte,* or not to make, an order for further proof. But the *claimant* may move for the order, and show the grounds of the application by affidavit, or otherwise, at any time before the final decree is rendered; and such an order may also be made in this court. The making of it anywhere is controlled by the circumstances of each case. It is made with caution, because of the temptation it holds out to fraud and perjury; and made only when the interests of justice clearly require it.

APPEAL from a decree of the District Court for the Southern District of New York, condemning as *enemy's property* the bark Sally Magee and her cargo, captured during the late rebellion; the question before this court being, however, only as to the cargo; the condemnation of the vessel not being appealed from. The case was thus:

Before the commencement of the rebellion; the vessel had been engaged in trade between Richmond and South America. Her outward voyages were usually to Rio Janeiro. She left Richmond upon her last voyage on the 2d of January, 1861—that is to say, about three months before the outbreak of our civil war*—with a cargo of flour and domestic goods, shipped by Edmund Davenport & Co., of Richmond, and consigned to Charles Coleman & Co., at Rio. She took in a return cargo of coffee and a small parcel of tapioca. Four bills of lading were given. Three of them were to Coleman & Co.; two for consignments to Davenport & Co.; the third for a consignment to Dunlap & Co. The other bill of lading was to Moore & Co., of Rio, and was for a consignment also to Dunlap & Co. *All the goods were to be delivered at Richmond.*

---

\* The firing on Fort Sumter was upon the 12th April, 1861.

The vessel sailed from Rio for Richmond on the 12th of May, 1861. When forty-five days out from Rio, and before any intelligence of the war had reached her, she was captured as prize, and sent to New York, where both the vessel and cargo were libelled in the District Court. Upon the return of the monition, on the 23d of July, 1861, two claims, both made by Fry, Price & Co., of New York, were interposed relative to the cargo. In July, 1863—*two years after the proceedings on prize were instituted*—both the vessel and cargo were condemned, the latter having been appraised at the considerable sum of $69,000.

One of the claims made by Fry, Price & Co., was in behalf of Coleman & Co., and embraced that part of the cargo (1500 bags of coffee) which was consigned to Davenport & Co. It stated among other things that Coleman & Co., as factors and commission merchants, at Rio Janeiro, " had been directed to purchase and ship for the account, and to the consignment of Davenport & Co., coffee, if procurable, *at not over ten and a half cents a pound ;* that Coleman & Co. did make the shipment of the cargo above claimed to the consignment of Davenport & Co., but that by the invoice thereof it appeared that the said purchase was not made at or within the said limit; for which cause, Davenport & Co. had refused to receive it as purchased for their account, or otherwise than on the account of the shippers, Coleman & Co., and as agents of necessity for them; and that the said Davenport & Co. had authorized Fry, Price & Co. to receive the same in their place and behalf as aforesaid."

The claim was supported by the affidavit of Mr. Price of this firm. It alleged " that the facts above stated" were stated " from the correspondence of the parties, which he believes to be true." *None of the papers referred to were put in evidence by annexing them to the affidavit or otherwise.*

The other claim related to the residue of the cargo— about 2000 bags of coffee—consigned to Dunlap & Co., of Richmond. It was not denied that this was enemy's property. The claimants alleged, however, *a lien.* Their claim

stated that Dunlap & Co. owed them a balance of $35,326, and upwards, and "that they were authorized and directed by that firm to receive and sell the coffee, and apply the proceeds, as far as necessary, to the payment of the debt, and to hold the balance for the account of the debtor firm." Like the first claim, this one was supported by the affidavit of Mr. Price, who swore that he stated the above facts "*from correspondence with the firm of Dunlap & Co., and copies of the invoices of the cargo, and believed the same to be true.*" But as in the case of the preceding claim, *neither correspondence nor copies were produced.*

It is necessary here to say that, by act of Congress of March 3, 1863,* "to protect the liens upon vessels in certain cases, and for other purposes," it is provided, that where any vessel or other property shall be condemned in proceedings authorized by certain preceding acts (against rebels), the court making the decree of condemnation shall, *after condemnation* and before awarding the distribution of the proceeds of confiscated property, provide for the payment out of the proceeds, of any *bonâ fide* claims by any loyal citizens intervening in the prize proceedings, which shall be duly established by evidence.

*Mr. Lord, for the claimants:* The vessel having been captured before any intelligence of our civil war begun had reached her, the question of intent to break the blockade of our Southern coast—so usual a question of late in the court—does not arise.

The question, as to the claim set up for Coleman & Co., is one of enemy's property purely; and as to the other, a question of the protection, under the statute of March 3, 1863, of a *lien* held by loyal citizens of New York. In both cases we suppose that the *onus probandi* is with the captors.†

I. *As respects the claim in behalf of Coleman & Co.*
The question is one simply, as we have said, of the enemy

---

* 12 Stat. at Large, 762; referring to certain prior acts.

† The ship Resolution, 2 Dallas, 22.

*status* of the claimant; a proprietary question, whether at the time of capture the cargo was the property of neutral or of enemy? Now,

1. A foreign correspondent making a shipment on the order of his principal, but without the limits of the order, does not vest the property in the principal without some act of adoption, or waiver by him. Here there was none.

The doctrine has been uniform in the prize courts, that although goods are ordered by a correspondent, yet if they are subject to rejection by the principal, the property does not pass unless accepted. Several cases to this effect—the *Merrimack* and others—may be seen in 8th Cranch.*

In *The Frances,*† one of them, a British agent in Great Britain, in orders given before the war to purchase goods for the claimants, an American house in New York, made purchases, but deviated from the orders. He said: "I have exceeded in some articles, and have sent you others not ordered. I leave it with yourselves to take the whole of the two shipments, or none at all, as you please." The bill of lading and invoice were expressed to be on account of *the American consignees.* Marshall, C. J., speaking of the consignment in excess of orders, says:

"This, then, is a new proposition, on which the American correspondents are at liberty to exercise their discretion. They may accept or reject it, and until they do accept it, the property must remain in the enemy shipper."

So here it remained in the Brazilian shipper until the deviation from orders should have been accepted or waived.

2. The claim and test affidavit were sufficient. The claimants at Rio could not be expected to verify the claim personally; the verification by an agent is all that can be asked. The Richmond consignees, from living in Virginia, could not be expected to make the verification. The devolution of the rejected purchase to a competent agent, is in all respects proper, and the only way the claim could be put in.

---

* Pages 317, 325, 328, 354. † Ib. 354.

The test affidavit with the claim is sufficient. The office of the test affidavit is not to supply the details of evidence, but to aver the simple fact of proprietary interest. The oath annexed is as efficient as any detail of circumstances or correspondence. An order for further proof is made by the court *ex motu suo* only. It was not competent to the claimant to apply for it. The affidavit is always the summary proof, and, until impeached by further proof, is decisive in prize proceedings.

There is no ground to doubt the truth of the affidavit, by reason of any want of statement in the bills of lading or papers, that the property is neutral. At the time of the last communication to Rio from the United States there was no war, blockade, or contraband, which the ship's papers could refer to. Nor could the correspondence between the parties embrace any letters from the consignees respecting this shipment. There is no ground of any suspicion of suppression or unfairness as to documents; and on the claim, not impeached, and on the ship's papers, the coffee of Coleman & Co. should not have been condemned, but restored to the claimants.

The decree of condemnation precluded all claim to offer further proof. Until the decree, no further proof could be admitted, even if the matters alleged were material, or were capable of an explanation consistent with the right to restoration.

II. *As to the claim of Fry, Price & Co., as lien creditors of Dunlap & Co.*

By the doctrines of prize, a creditor having a mere lien, not being a direct proprietary interest accompanied with possession, cannot be heard in a prize proceeding. Whatever be his right, the captured property must be condemned. But the act of March, 1863, introduces certain new and benignant, though just features into the code of prize.

It is submitted that this act should be largely construed in favor of creditors. Also, that no condemnation creates any rights to interfere with the payment of any debts which

could be specifically enforced.  It overrides condemnations, and has the operation of an actual amnesty as to honest creditors.  The cases, indeed, were innumerable where property became subject to condemnation during the rebellion, which to have swept from honest creditors would have been most unjust and cruel; and the principle, the spirit of the act in all particulars, is as applicable, notwithstanding its precise language, to prize condemnations as to any others.

*Mr. Speed, A. G., and Mr. Coffey, contra.*

Mr. Justice SWAYNE delivered the opinion of the court.*

When a vessel is liable to confiscation, the first presumption is that the cargo is in the same situation.†  The bills of lading in the case are in evidence.  The goods were consigned to parties living in Richmond.  This vested the ownership in them.  Such is the legal effect of a bill of lading as regards the consignee, unless the contrary is shown by the bill of lading itself or by extrinsic evidence.‡  Upon the proofs there was clearly a *primâ facie* case for the condemnation of the entire cargo.

We will consider, first, the claim in behalf of Coleman & Co.

In our opinion the law was correctly laid down by the counsel of the appellants.  If the facts alleged are made out by the proofs, the claimants are entitled to restitution.  The cases referred to in 8th Cranch are in point, and are decisive upon the subject.  General principles, in the absence of these authorities, would have led us to the same conclusion. When an agent exceeds his authority, the principal is not bound unless he ratifies.  Upon being informed he must exercise his election.  Whatever may be the motives of his decision, the result is the same.  His acceptance or rejection determines his rights and obligations.

Here, if Coleman & Co., as factors, bought the coffee at a

---

* Nelson, J., not having sat; having been indisposed.

† 2 Wheaton, Appendix, 24.

‡ Laurence *v.* Minturn, 17 Howard, 100.

price exceeding the limit prescribed by Davenport & Co., and the latter, upon learning the fact—no matter when that was, or what the circumstances—repudiated the purchase, the title of the factors thereupon became absolute, and none passed to the principals for whom the purchase was made.

It remains to consider how far the facts alleged by the claimants are sustained by their proofs. The burden of the affirmative rests upon them. The language of the test affidavit implies clearly that the correspondence to which it refers was in their possession. It is not produced, and its absence is not accounted for. The court is asked to take the averment of the affiant as to its existence and construction, in place of the correspondence itself. This no sound system of jurisprudence would tolerate. If the correspondence was not in the possession of the claimants, doubtless that and other evidence was at the command of Davenport & Co.

Between the filing of the claim and the time when the decree was rendered more than two years elapsed. There was time to communicate repeatedly with Rio. Coleman & Co. could have furnished full testimony. If the facts were as alleged it would have been conclusive in their favor. Nothing is produced from them. It does not appear they were applied to, nor does it appear—large as is the amount involved—that they have done any act, or manifested any interest touching the controversy since it began. We can draw but one inference from these facts. It is, that if the evidence were produced, it would be fatal to the claim.

The appellants insist that an order of the court, made *suâ sponte*, after the hearing upon the preparatory evidence, was indispensable to enable them to introduce any additional testimony; that it was not competent for them to apply for such an order; and that none having been made, the test affidavit should have been held sufficient. Such is not the rule as to further proof. If it were, the claimants would not be excused for withholding the correspondence, or not accounting for its absence when the test affidavit was submitted.

Cases of prize are usually heard, in the first instance, upon

the papers found on board the vessel, and the examinations taken *in preparatorio;* and it is in the discretion of the court thereupon to make or not to make the order. But the claimant may move for the order, and show the grounds of the application by affidavit, or otherwise, at any time before the final decree is rendered. Such an order may also be made in this court. In one case affidavits were submitted in support of the application, and the order was made after the cause was heard.* In another case a parol statement was submitted by the counsel for the claimant before the hearing, and the consequences were the same.† The result is always in the discretion of the court, and that discretion is controlled by the circumstances of each case. The order is made with great caution, because of the temptation it holds out to fraud and perjury. It is made only when the interests of justice clearly require it. In the case before us no application was made in the court below, and none in this court.

If it be said the court erred in not making the order without an application, and without a showing, we cannot assent to the proposition. The state of the evidence warranted the decree; and, as the case was presented, there was no reason to believe that further evidence would benefit the claimants.

The other claim relates to the coffee consigned to Dunlap & Co., of Richmond, and it is not denied that this was enemy property. The claimants allege a lien. The claim states that Dunlap & Co. owed them a balance of upwards of $35,326, and that they were authorized and directed by that firm to receive and sell the coffee, and apply the proceeds, as far as necessary, to the payment of the debt, and to hold the balance for the account of the debtor firm.

The same affiant made the test affidavit, as in the other case. He referred, as in that case, to an important correspondence, and failed to produce it. The same remarks apply upon the subject. It is to be inferred, also, that the

---

* Wheaton on Captures, 284–5.
† The London Packet, 2 Wheaton, 372.

letters were written after the shipment of the cargo, and, indeed, after the capture. In either case the arrangement was made too late to have any effect.

The ownership of property in such cases cannot be changed while it is *in transitu.* The capture clothes the captors with all the rights of the owner which subsisted at the commencement of the voyage, and anything done thereafter, designed to incumber the property, or change its ownership, is a nullity. No lien created at any time by the secret convention of the parties is recognized. Sound public policy and the right administration of justice forbid it. This rule is rigidly enforced by all prize tribunals. The property was shipped to the enemy. It was diverted from its course by the capture. The allegation of a lien wears the appearance of an afterthought. It strikes us as a scheme devised under pressure, to save, if possible, something from the vortex which it was foreseen inevitably awaited the vessel and cargo.

The claimants invoke the aid of the act of March 3, 1863. It cannot avail them. The facts relied upon as fundamental to the claim are not established to our satisfaction. It is, therefore, unnecessary to consider the subject of the proper construction of the act, or the effect of the facts, if they had been sufficiently proved.

Decree affirmed.