## In re CALVI.

(District Court, N. D. New York. March 24, 1911.)

1. FRAUDULENT CONVEYANCES (§ 47*)—STOCK OF GOODS—SALE IN BULK LAW.

Under the express provisions of Personal Property Law New York (Consol. Laws, c. 41) § 44, transfer of the stock of a retail merchant to two different purchasers in bulk, some of which had never been unpacked from the original cases in which they had been received, for much less than their value, was presumptively fraudulent where five days' notice of such sale or proposed sale had not been given to the seller's creditors.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 34; Dec. Dig. § 47.*]

2. FRAUDULENT CONVEYANCES (§ 47*)—SALES IN BULK—STATUTES.

Personal Property Law New York (Consol. Laws, c. 41) § 44, regulating sales of goods, wares, and merchandise in bulk otherwise than in the ordinary course of business, imposes on the proposed buyer the duty of making due inquiry of the seller as to the seller's creditors, so that, if he fails to do so, he acts at his peril and is charged with notice of their existence, but not with the seller's intent to abscond without paying them.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 34; Dec. Dig. § 47.*] .

3. BANKRUPTCY (§ 181*)—BULK SALES—PERSONAL PROPERTY—CONSIDERATION.

Where buyers of personal property in bulk purchased without sufficient inquiry as to the seller's creditors as required by Personal Property Law New York (Consol. Laws, c. 41) § 44, but paid a fair consideration, they obtained a good title to the property as against the seller's trustee in bankruptcy and his creditors, unless the circumstances attending the sales were such as would have put them on inquiry that the seller's object was to defraud his creditors and appropriate the proceeds otherwise than to the payment of his honest debts.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 181.*]

4. WITNESSES (§ 321*)—EVIDENCE (§ 591*)—ADVERSE WITNESS—CONTRADICTION.

A party calling a witness represents him as worthy of credit, and cannot impeach him in any way, but is not necessarily bound by what he says, provided he is able to prove by other witnesses that the facts are in truth different than those testified to by the witness, but, if unable to do this, the party calling the witness is bound by the facts testified to, unless the witness shows himself to be unworthy of credit or not entitled to be believed, or is discredited by other facts and circumstances in the case.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1094, 1099–1100; Dec. Dig. § 321;* Evidence, Cent. Dig. §§ 2440–2443; Dec. Dig. § 591.*]

5. BANKRUPTCY (§ 303*)—FRAUDULENT DISPOSITION OF GOODS.

In a proceeding to recover goods sold by the bankrupt in violation of Personal Property Law New York (Consol. Laws, c. 41) § 44, regulating sales

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in bulk, evidence *held* insufficient to warrant a finding that the buyers had established by clear and positive evidence that they acted in good faith and without reasonable grounds to believe that the bankrupt in making the sale was actuated by an intent to defraud his creditors, and to convert the proceeds to purposes other than the payment of his debts.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

In the Matter of Bankruptcy Proceedings of Frank Calvi. Application for the confirmation of the report of the special master in proceedings to recover property alleged to have been sold in fraud of creditors, and hearing on exceptions. Exceptions sustained.

E. C. Baker, for petitioning creditors.
B. & C. B. Johnson, for George Calvi.
F. W. Youmans, for Horace Infusino.

RAY, District Judge. This proceeding involves the title to certain goods, wares, and merchandise, largely rubber goods, purchased by Frank Calvi of the petitioning creditors and others prior to October 1, 1910, and delivered to said Frank Calvi on credit at Delhi. The value of such goods is about $2,500. A part of the goods were found in the possession of George Calvi at Andes, N. Y., when the petition herein was filed. The remainder thereof were found in the possession of Horace Infusino at the former place of business of said Frank Calvi in Delhi, N. Y. The involuntary petition herein was filed October 24, 1910, and a receiver of the property of said Frank Calvi was appointed, who duly qualified. The order appointing the receiver was accompanied by an injunction directed against the said George Calvi and Horace Infusino enjoining and restraining them from disposing of the said goods so found in their possession. The said George Calvi and Horace Infusino came in and submitted themselves to the jurisdiction of the court, and moved to vacate the injunction, and claimed to be the bona fide owners of said goods, and thereupon an order was made referring it to Andrew J. McNaught, Jr., one of the referees in bankruptcy, as special master, to take proofs and report to the court with findings of fact as to whether or not the said George Calvi and Horace Infusino had purchased of Frank Calvi the said goods, wares, and merchandise found in their possession, respectively, in good faith and for a full and fair new consideration prior to the institution of the bankruptcy proceedings. The reference has been executed, and the said special master has made his report, to which exceptions have been filed by the petitioning creditors. On or about the 7th or 8th day of October, 1910, the said Frank Calvi, the bankrupt, disappeared from Delhi with his family, and he has not been found or heard of since. He was served with a writ of subpœna herein by publication and adjudication has been duly made.

Frank Calvi ran a small boot and shoe store in the village of Delhi, Delaware county, N. Y., and was generally supposed to be moderately prosperous in business, and honest. He had built up a fair credit with the trade, and had a fair commercial standing. Prior to the spring and summer of 1910, his purchases had been moderate, but

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

at about that time he increased his orders with various merchants, and ran in debt for goods purchased of parties away from Delhi in a sum in excess of $3,000. October 6th his goods on hand at Delhi were of the value of about $2,500, and mostly unpacked; that is, they were in the packages or boxes in which they were shipped to him by the merchants from whom purchased. He lived with his family in the store, and his household belongings, aside from wearing apparel, were worth less than $25. Frank Calvi had a bank account with a bank in Delhi, and October 1, 1910, after making a deposit of $62.82, the balance to his credit in said bank was the sum of $870.14. It seems from the evidence that his account was written up and his checks on this account surrendered some time between the 1st and the 6th day of October. October 6th the balance to his credit was $870.14. While doing business between those dates he made no deposit. A few days prior to October 6th, said Horace Infusino went to Delhi from a place in the state of Pennsylvania, where he had been at work as shoemaker and shoe repairer. He claims that he had between $600 and $700 in money upon his person, and that he contemplated buying a boot and shoe business. On the 6th day of October, George Calvi, a young unmarried man, 22 years of age and a second cousin of Frank.Calvi, who was doing a small business at Andes, Delaware county, a few miles from Delhi, purchased of Frank Calvi certain boxes of the goods referred to which had not been unpacked, and same were removed to Andes. It is not denied that these goods were of the value of about $1,000, a little less than that. George Calvi claims that he paid for these goods so purchased the fair value thereof with his own money, and that he paid for same in cash in the store of said Frank Calvi in the evening, and he is corroborated by a fellow countryman of the Calvis, who says he was present and saw the money counted out in payment for the goods. George Calvi says he was ignorant of the fact that his cousin Frank Calvi was owing for these goods and others as above stated. No notice of this sale or proposed sale in bulk was given to the creditors of Frank Calvi, and the evidence fails to show that George Calvi took pains to inform himself on the subject. In fact, he took the bills for these goods rendered to Frank Calvi by the sellers thereof and checked up the merchandise. The bills were not receipted. He says that Frank Calvi told him he had sent check in payment, it is presumed, to the firm or firms of whom the goods had been purchased. On the day or day before this alleged sale took place, George Calvi drew from the bank the exact balance to the credit of Frank Calvi, $870.14, on a check of Frank Calvi's made that day. George Calvi says that he used this money, with some other money which he had, to pay Frank Calvi for the goods so purchased. On the face of things and standing alone, it would appear that the payment for these goods sold and delivered to George Calvi was made to Frank Calvi with his own money as it had been in the bank in the name of Frank Calvi and deposited by him from time to time. It was made up of the balance to his credit, taking into account deposits upon which checks had been drawn at various times. The force of this is sought to be broken, and the spe-

cial master finds is broken, by the testimony of George Calvi, who testifies that from time to time he had loaned to Frank Calvi various sums of money, and that the indebtedness of Frank Calvi to him on the 6th day of October, 1910, was just $870.14, the exact sum Frank Calvi had to his credit in bank on that day. He says that he had notes or receipts, writings of some kind, to show for this money, but that on receiving it from Frank Calvi by check on the 6th he surrendered to Frank Calvi such evidences of indebtedness. George Calvi further testifies that he got his money from Frank Calvi at this time for the purpose of going to Binghamton or elsewhere to purchase a large addition to his stock of goods, having determined to largely increase his business at Andes; that, when he made this purpose of his known to Frank Calvi, Frank proposed to sell to him the goods which he had in his store and which he did sell and deliver as above stated.

The petitioning creditors say that this is an improbable story, especially when taken in connection with the sale of the remainder of the stock to Infusino and the business George Calvi had been doing at Andes, and what must have been his financial condition. George Calvi says that he had worked about 10 months for Frank at Delhi, and then went to Andes, where he worked about 10 months for Frank, who ran the business there, and that he then bought out the business at Andes from Frank paying about $131 therefor. It is contended that at his age running such a business at Andes he would not have been able to loan this amount of money to Frank Calvi, especially as it appears from the statement of George Calvi that he had other money to the amount of about $800, several hundred dollars of which was deposited in the bank at Andes. It may be that this alleged payment was a sham, and that the money paid over in the evening by George Calvi to Frank Calvi belonged to Frank. This involves the conjecture or speculation that the goods were left with George Calvi or turned over to him to dispose of and remit the proceeds to Frank Calvi.

Under the personal property law of the state of New York, such a sale in bulk is presumed to be fraudulent, unless five days' notice of such sale or proposed sale has been given to the creditors of the vendor. In Sprintz v. Saxton, 126 App. Div. 421, 110 N. Y. Supp. 585, this provision has been held valid as a rule of evidence. Presumptively, then, this sale in bulk of these goods by Frank Calvi to George Calvi was fraudulent and void. The burden was placed on George Calvi and Frank Calvi to show that the sale was not fraudulent; that is, that the goods were sold in good faith and for a full and fair consideration. The burden was also upon George and Frank Calvi to show that there was no purpose or intent on their part to cheat or defraud the creditors of Frank Calvi, especially the creditors who had sold these particular goods to Frank on credit. If George Calvi had reason to believe that Frank Calvi was disposing of his goods to him with the intent to take the proceeds and leave the country, leaving his creditors unpaid, he was a party to a fraud, and, in view of the statute referred to requiring notice of such sale to the creditors which

was not given, he could not shield himself from the consequences by showing that he paid Frank Calvi full value for the goods with his own money. He attempts to avoid this phase of the situation by his statement that Frank Calvi told him he had sent check in payment for the goods.

George Calvi also testifies that Frank Calvi told him, as did his family, that he was going to leave Delhi and go to New York. The probability is that with the proceeds of these goods and such other property as he had he has returned to Italy. George Calvi, as stated, paid $131 for the stock and business at Andes two years before. He had purchased to replenish his stock of Frank Calvi from time to time, making small purchases only. In the spring of 1910 he says he purchased stock of him to the amount of $350, the largest purchase he ever made. He also says that, when Frank suggested selling him this large quantity of unpacked goods, he looked into one or two of the boxes only; that he objected to making such a large purchase, but Frank insisted it was all right—he could enlarge his business. His evidence as a whole is utterly inconsistent with the theory that he intended to purchase a large stock at Binghamton or elsewhere. If, in fact, Frank owed him about $900 and prior to the sale announced his intention of leaving Delhi and going to New York, it would account for his asking payment from Frank, although he insists that Frank had stated, and that he, George, believed, he was worth $20,000. The reason George gives for demanding his money of Frank is that he wanted it to purchase goods, and this in the face of his statement that he did not intend to make any large purchase of stock. Before receiving the check from Frank, he says he had something like $700 or $800 in money on his person, over $500 of which he had taken from the bank at Andes, and other paper representing money. The reason he gives for asking the money of Frank is, of course, inconsistent with many of his other statements. In answer to the statement of George Calvi that Frank Calvi told him he had sent a check to the Utica firm in payment for the goods, Mr. F. J. Bowne testifies that George Calvi told him when he went there about October 15th, looking for the goods, that he did not ask Frank Calvi if they were paid for. The purchase of these goods by George Calvi of Frank Calvi was entirely outside their usual course of dealing, and entirely outside the usual course of dealing between merchants or others except wholesalers. The fraud, corruption, and dishonesty of Frank Calvi, who made the sale, stands out and shows conspicuously. On his part it was a disposition of his property in fraud of his creditors beyond all question as will more closely appear when we come to the question of the disposition of his remaining goods to Infusino. If Frank Calvi owed George Calvi $870.14, the exact balance he had in bank, he was paying no interest, and he had paid George by turning over this property, and George knew or had reasonable cause to believe he was insolvent and that a preference, which such payment would have been, was intended, and Frank had been thrown into bankruptcy within four months thereafter, the transaction would have been avoided as a preference. On the day succeeding the sale to George Calvi, Horace Infusino appeared at Frank Calvi's place of business, and purchased and took posses-

sion of all the remaining stock of Frank Calvi, including all his household furniture, which, however, was worth only about $17. He came about that time from Halstead, Pa., and was a shoemaker by trade. As stated, he claims he had about $650 on his person and intended to purchase a shoe business. He says he visited Walton and one or two other places in that vicinity with that object in view, and proposed to one person to buy him out. It is not shown he did not. His statement is that in fun he offered $650 for all the property of Frank Calvi, all Frank had left, including household goods, prior to the 6th of October; that Frank asked $1,500; that he stayed that night with Louis Scharano, who was in Frank Calvi's employ, and borrowed of him $400; and that the next day, October 7th, he offered Frank Calvi $1,-000 for all such goods, etc., and that his offer was accepted. A part of these goods were unpacked. He says they went to a law office and a bill of sale was prepared, executed, and delivered and the $1,000 paid over to Frank Calvi, who then and there stated he only owed one bill of $25 or thereabouts. It is not denied that these goods were worth at least $1,250. As to what is stated to have taken place at the attorney's office, George Calvi is corroborated by Mr. Hewitt, the attorney, and Mr. Cameron, a student in the office; that is, that a bill of sale of everything was drawn, executed, and delivered and $1,000 paid to Frank Calvi by Infusino, and that Calvi stated to Hewitt he only owed one bill of some $25, and that in Binghamton, and he was going there to pay it in a day or two. No notice of this sale or intended sale was given to the creditors of Frank Calvi, and under the personal property law to the state of New York the sale was presumptively in fraud of creditors. The burden was on Frank Calvi and Horace Infusino to show that it was not; that it was made bona fide and for a full and fair consideration. Infusino claims that he happened to be in Delhi looking for a business to purchase, and was not sent for; while Mr. Bowne testifies that, when he was there soon after looking for the goods, Infusino told him he was sent for by Frank Calvi. George Calvi and Infusino each deny that they knew the other was dealing with Frank Calvi, and deny any communication with each other on the subject. The petitioning creditors say that it is improbable that Infusino happened along with $650 in a mood to purchase, just in "the nick of time"; that the only rational conclusion is that Bowne tells the truth, and that Infusino, a former employé of Frank Calvi, was sent for by him to take the property or whatever was not disposed of to others. Infusino made no careful examination of the goods before purchasing. Most of them he did not see at all. He saw the unpaid bills, but claims it was after he had made the purchase and paid his money.

From the way these transactions were conducted and on all the evidence, I am morally certain that George Calvi and Horace Infusino were aiding and abetting Frank Calvi to dispose of his property in fraud of his creditors, aiding him to turn it into money, knowing he was owing for same or the most of same, at least, and also knowing he intended to depart—abscond—without paying them. They obtained the property at a bargain clearly, as rubber goods had gone up in value 15 per cent. between the purchase by Frank Calvi and these sales to

George Calvi and Horace Infusino. But a conviction to a moral certainty is not always in accord with the sworn evidence. Either the testimony of Infusino and George Calvi must be rejected and disregarded, or the conclusions of the special master affirmed. Many a court has been compelled to accept and act upon the testimony of witnesses whose story they did not believe. Why the court does not credit the witness is a matter somewhat difficult to explain. Sometimes it may result from suspicion created by the circumstances. It is true that fraud must be proved, but here fraud is presumed because of the arbitrary but wise rule of evidence prescribed by the Legislature of the state. Section 44, art. 3, c. 45, Laws 1909, being chapter 41 of the Consolidated Laws, and known as "Personal Property Law," reads as follows:

"Sec. 44. Transfer of Goods in Bulk. (1) The transfer of any portion of a stock of goods, wares or merchandise, otherwise than in the ordinary course of·trade, in the regular and usual prosecution of the transferrer's business, or the transfer of an entire such stock in bulk, shall be presumed to be fraudulent and void as against the creditors of the transferrer, unless the proposed transferee shall, at least five days before the transfer, in good faith, make full and explicit inquiry of the transferrer as to the names and addresses of each and all of the creditors of the transferrer, and unless such transferee shall at least five days before the transfer in good faith notify or cause to be notified of the proposed transfer personally or by registered mail each of the creditors of the transferrer of whom such transferee has knowledge, or can with the exercise of reasonable diligence acquire knowledge."

Neither George Calvi nor Horace Infusino complied with this statute. There was no pretense of compliance. To get at what the transactions were the petitioning creditors were compelled to call, and did call, George Calvi and Infusino as witnesses. I do not see how I can disregard their testimony, or hold the facts to be otherwise than as they state resolving all doubtful questions arising on their testimony against said Calvi and Infusino, and adopting that theory of the evidence which bears most strongly against them. Each was testifying in his own interest, and was under strong temptation to give untrue testimony and color everything in his own favor. Still, in the face of the evidence, how can I find or hold that either George Calvi or Infusino did not pay substantially a fair value for the goods with his own money. There is some evidence they knew of the existence of one or two creditors of Frank Calvi, but no substantial evidence they or either of them actually knew he was disposing of his property to defraud creditors, or that the sales would have that effect. Both testify they did not know of any creditors. I think the unpaid bills told George Calvi that the Utica firms from whom the goods he purchased came were unpaid. Must I accept the statement of George that Frank said he had sent check? Infusino concedes he knew of one unpaid creditor. The statute quoted does not in terms make the failure of the proposed transferee to inquire for the names and addresses of the creditors of the proposed transferror of property in bulk evidence that the transferee knew of the existence of such creditors as in fact existed, or in terms charge such transferee with knowledge of their existence. But it does make it the duty of the proposed transferee to inquire. It puts him on inquiry. The rule may also be invoked that, where a party is possessed

of facts which put him on inquiry, he is bound to make inquiry, and is charged with such knowledge as he might have obtained by due inquiry.

Here Frank Calvi was urging a sale in bulk to George Calvi, with the expressed purpose of selling out and going to New York. They proceeded and consummated the transaction in violation of the "Personal Property Law," with knowledge of which both were charged. George did not make any inquiries as to Frank's general indebtedness. He did, he says, inquire as to the particular goods he was purchasing, whether paid for or not. He also says Frank had stated he was worth $20,000, and he supposed him good. The testimony of Infusino on this subject of inquiry is quite confused and contradictory. Can it legally be inferred that either Infusino or George Calvi knew or had reason to believe Frank Calvi intended to cheat or defraud his creditors, or that their purchases, respectively, would have that effect? In United States v. Detroit Lumber Co., 200 U. S. 321, 331, 332, 26 Sup. Ct. 282, 285 (50 L. Ed. 499) the Supreme Court holds that:

"The rule of law concerning good faith is the same in respect to purchases of land and timber as that which obtains in other commercial transactions, and no one is bound·to assume that the party with whom he deals is a wrongdoer; but on paying full value for the property presented, the title to which is apparently valid, and in regard to which there are no suspicious circumstances, he will acquire the rights of a bona fide purchaser."

See, also, to same effect in case of personal property, Jones v. Simpson, 116 U. S. 609, 615, 6 Sup. Ct. 538, 29 L. Ed. 742. This, of course, goes to mere title, and not to the question of aiding the seller to dispose of his property in fraud of creditors. However, the principle must apply that the purchaser, in the absence of suspicious circumstances, is not bound to assume the seller is a wrongdoer, and intends to abscond with the proceeds of the·property, and leave his creditors unpaid. I think the section of the personal property law quoted was intended to, and· does, in cases of sales of personal property in bulk, other than in the usual course of business, the business carried on by the seller, not including such sales by the persons and officers of court excepted from its provisions, impose upon the proposed purchaser the duty of making due inquiry of the proposed seller as to the creditors of such proposed seller, and that, if he fails to do this, he so acts at his peril, and is charged with notice of their existence. But does this carry us to the further proposition that the purchaser is charged with notice that such a seller intends to abscond, leaving his creditors unpaid, or appropriate the proceeds of the sale otherwise than to the payment of his honest debts? In Jones v. Simpson, 116 U. S. 609, 614, 6 Sup. Ct. 538, 541, 29 L. Ed. 742, which was the case of a sale of personal property (approved in United States v. Detroit Lumber Co., 200 U. S. page 332, 26 Sup. Ct. 282, 50 L. Ed. 499) the court held that:

"A sale of personal property made by the vendor with intent to defraud his creditors, but for a valuable consideration paid by him to the vendee, followed by actual and continued change of possession, is valid against the vendor's creditors, unless it appears that the vendee acted in bad faith."

The court, at page 614 of 116 U. S., at page 541 of 6 Sup. Ct. (29 L. Ed. 742), said:

"But, such payment being shown, the vendee is entitled to a verdict and judgment, however fraudulent may have been the intent of the vendor, unless it appears affirmatively from all the circumstances that he purchased in bad faith. And such bad faith may exist when the vendee purchases with knowledge of the fraudulent intent of the vendor, or under such circumstances as should put him on inquiry as to the object for which the vendor sells."

It follows that, a fair consideration having been paid, assuming that George Calvi and Infusino are charged with knowledge of the existence of Frank Calvi's creditors, suitable and statutory inquiry not having been made, George Calvi and Horace Infusino obtained good title as against a trustee in bankruptcy—that is, the creditors of Frank Calvi—unless the circumstances attending these sales were such as should have put them on inquiry as to the object or purpose for which Frank Calvi was selling. If the statute (Personal Property Law) quoted imposed that burden, then did these purchasers fail to do what the law imposed on them the duty of doing? If not, if the statute imposed no such duty, we are to inquire whether or not the circumstances were such as put, or should have put them, or either of them, on inquiry as to the object of Frank Calvi in making the rule. And would inquiry have helped the matter? On this subject George Calvi says he was informed by Frank Calvi that his object in selling out was that he and his wife did not like it at Delhi, and he was going into business in New York City, and that he, George, believed him. Infusino says he knew nothing of any reason Calvi had for selling out, only he did know his wife was anxious to go to New York.

In Barr as Trustee in Bankruptcy v. Sofranski et al., 130 App. Div. 783, 115 N. Y. Supp. 533, it was held that:

"Although the facts were proved by hostile witnesses called by the plaintiff, the court cannot find contrary to the testimony without direct evidence showing that the facts were different."

The court cites Hankinson v. Vantine, 152 N. Y. 20, 27, 46 N. E. 292, 294. In that case the Court of Appeals said:

"We think the evidence of the appellant to the effect that she never knew or heard of any of the alterations made, except the raising of the ceiling, must be regarded as sufficient to establish that fact. The plaintiff cannot claim that the referee had a right to disregard her evidence upon the ground that she was an interested party because he called her as a witness and proved these facts by her, thereby assuring her credibility as a witness upon that fact. While he might have shown the facts to be different, he could not impeach or deny her credibility. Under these circumstances, we think those facts must be regarded as established, that the learned referee erred in refusing to find them upon the appellant's request, and in finding that the appellant consented to the alterations made."

In Lopez v. Campbell, 163 N. Y. 340, 57 N. E. 501, the court held:

"In determining the question whether an insolvent corporation or its officers with the intent of giving a preference to a creditor performed any act which enabled him to obtain a judgment, where the evidence is capable of an interpretation in which the absence of a wrongful act is equally consistent with the presence of such act, that meaning must be ascribed thereto which accords with its absence, since a wrongful act can only be established by

proof of such circumstances as are irreconcilable with any other theory than that the act was done."

These parties, George Calvi and Horace Infusino, sworn and examined on the part of the receiver or petitioning creditors, in effect, deny any knowledge or suspicion of a purpose on the part of Frank Calvi to leave without paying his creditors. If George Calvi believed that Frank and his wife did not like it in Delhi and were going to New York City and into business there, and that he was worth about $20,000, it would account for a sale of his stock in bulk, or a part of it in bulk and a willingness to make a sacrifice in selling. To make out fraud from circumstances, in this case, the apparent willingness and haste to sell, want of compliance with the statute and sacrifice on the stock, all known to the purchasers, and lack of examination on their part, the evidence must be inconsistent with honest action on the part of these vendees, and not capable of reconciliation with the existence of an honest purpose on their part; that is, a state of facts must appear inconsistent with the testimony of Calvi and Infusino. That is, the circumstances must point with substantial certainty to the existence of a purpose on their part, respectively, to aid Frank Calvi in defrauding his creditors.

In Sprintz v. Saxton, supra, the Appellate Division said of this statute, the personal property law, as now written:

"Instead of declaring such a sale invalid unless certain conditions are complied with, the statute now makes such sale, unless these conditions are complied with, presumptively fraudulent and illegal. In fine, the presumption is against the bona fides of the sale."

This, if correct, means that presumptively George Calvi and Infusino intended to aid Frank Calvi in defrauding his creditors. Consideration is one thing; bona fides another. The presumption, then, is, George Calvi and Horace Infusino having taken this property and paid substantially a fair value, that they took same with the intent to aid Frank Calvi in cheating and defrauding his creditors. If the receiver or petitioning creditors had shown by George Calvi and Infusino that no notice was given to the creditors and had not gone into the transactions further with them, it could not be said the creditors had presented the testimony of those interested witnesses as proof of what the transactions in fact were. But the receiver, in fact, did prove the transactions in full by them, and called no witnesses to show that the actual facts, except as stated, were otherwise than as they stated them to be. Their statements, aside from the corroborating evidence as to what took place at the lawyer's office, is all the evidence we have as to what actually occurred. In Greenhall v. Carnegie Trust Co. (D. C.) 25 Am. Bankr. Rep. 300, 303, 180 Fed. 812, 815, Hand, D. J., said:

"At the outset I must clear up the confusion which appears to have arisen from the fact that the complainant has called witnesses by whose testimony he does not wish to be necessarily bound. It cannot be too often repeated that to call a witness is not in any sense to vouch for the truth of what he says. It does, at least, at law, prevent one from impeaching his general credibility in the formal ways recognized but that is all."

This is somewhat at war with the Court of Appeals of the state of New York, as that court has said that under such circumstances the

credibility of the witnesses cannot be denied by the party calling them. Hankinson v. Vantine, supra.

As I understand the law, when a party calls a witness, he represents him as worthy of credit, and cannot impeach him in any way, not even by proving contradictory statements, but is not necessarily bound by what he says, provided he is able to prove by other witnesses that the facts are in truth different from what such witness states them to be. But, if unable so to do, the party calling the witness must abide by what he says the fact was, unless the witness shows himself to be unworthy of credit or not entitled to be believed, or he is discredited by other facts and circumstances in the case. The party calling such a witness cannot say there is no evidence on the subject, or that the fact is not proved because the witness is unworthy of credit, unless the record itself shows the fact was otherwise. The cases cited demonstrate that this is the law. It is of course, true that what such a witness says may be so contradictory, inherently improbable, or so contradicted by conceded or proved facts and circumstances that the party calling him is not bound, and the court is not under obligation, to credit him. Should this be the result of the record presented, it would be equivalent to no evidence on the subject, and applied to this case would result in leaving the presumption of fraud, bad faith, but partially broken, as here Infusino is corroborated by the attorney and his clerk who say that Mr. Hewitt, appreciating the situation, inquired of Frank Calvi before the sale was made if he was owing debts, and that he stated in the presence of Infusino that he was not, except one of $25, which he was going to pay the next day or so. The question arises, How, then, can the court say that Infusino intended to aid in cheating or defrauding creditors when he was assured there were none? And, if Frank Calvi represented he had no creditors, how could notice be given creditors of the proposed sale? How can Infusino be placed in fault? But he knew of one unpaid creditor, and George Calvi does not show he did not know of any. As was said by the Supreme Court of the United States in Farley v. Hill, 150 U. S. page 577, 14 Sup. Ct. page 188 (37 L. Ed. 1186): "But a court cannot act upon such uncertain conjectures." See, also, Hoffman v. Overbey, 137 U. S. 465, 472, 11 Sup. Ct. 157, 34 L. Ed. 754. And a mere suspicion of fraud is not sufficient to warrant a finding of fraud. Gregg v. Sayre, 8 Pet. 244, 8 L. Ed. 932; Clarke v. White, 12 Pet. 178, 196, 9 L. Ed. 1046. I give no weight to the supposed ignorance of Infusino, or his youth, and recent coming from Italy. He displayed no ignorance in the ways of making a good bargain, and possibly his recent coming to the United States from the country where born is not a fact tending to enhance his credibility. But this cannot be considered by me. Again, this court has not seen or heard George Calvi or Infusino, and the special master did. He says, in effect, while conceding their contradictory and inconsistent statements, that they impressed him as candid and truthful. Hearing and seeing a witness is an important consideration in arriving at the truth of a transaction or the credit that should be given a witness. The court is not justified in disturbing the verdict of a jury or the finding of a referee or special master on a question of fact, unless satisfied from the evidence itself that the

verdict or finding was contrary to or unsupported by the evidence.

However, here we have the following facts: (1) Frank Calvi, an Italian, with less than $25 in value invested in household furniture, and running a small shoe and shoe repair shop and accustomed to purchase in moderate quantities, suddenly and in the absence of any reason for such action, unless to defraud his creditors, purchases over $3,000 worth of stock in the main rubber goods on credit, and places them in the back room of his shop unopened. (2) Shortly thereafter, a second cousin and former employé of Frank Calvi, one George Calvi, about 22 years of age, and who two years before started with a stock which cost $131, and who had not purchased to exceed $350 worth of stock at any one time thereafter, and who had known Frank in Italy, and, we may assume, was intimate with him, comes to Delhi, and without examination worth mentioning took over 30 of the packages of goods and paid therefor the cost price, about $980, when it is not denied they had advanced in value 15 per cent. after being ordered. (3) This payment was made in the shop in the evening mainly with money which up to that day had been in bank in the name of Frank Calvi and apparently his, and which George Calvi drew that day on a check given to him by Frank for the sum of $870.14, the exact balance of Frank's account. This balance was the result of deposits made from time to time on which checks had been drawn from time to time. (4) George Calvi, while saying that he had some $800, mostly in cash, on his person aside from the money above mentioned, and that he intended to go to Binghamton to purchase an addition to his stock, something he had not done before, and demanded the money of Frank for that reason, admits that he had not contemplated nearly so large a purchase; that notwithstanding his objections he was induced by Frank to make this large purchase of him and increase his business; that he took these 30 cases of goods unopened and without examination, except as to one or two, and paid back the same money he drew from the bank on Frank's check. He claims that, when he saw the unpaid bills for such goods, he asked about it, and was informed by Frank he had sent check. He made no other inquiry as to creditors if he made this. He immediately took the goods away. (5) He says he had loaned the money to Frank from time to time, and as a reason for demanding and receiving it at that time says he wanted it to purchase his additional stock with, but admits that he had enough other money and more on his person with which to purchase all the stock he contemplated buying. (6) No similar transaction had ever taken place between them, and he was informed by Frank that he and his wife did not like it there, and he was going into business in New York. George Calvi knew that Frank did not do a wholesale business, and that the transaction was entirely outside the ordinary course of trade in the regular and usual prosecution of Frank's business. (7) The personal property law of the state of New York demanded that George Calvi before making such a purchase of Frank make full and explicit inquiry of Frank as to the names and addresses of each and all of his creditors five days before the purchase, and that notice by registered mail be given to each and all of them of the proposed purchase, and that in default of such inquiry and notice the purchase

shall be presumed fraudulent and void. There was no pretense of compliance with this statute. (8) The transfer to George Calvi is therefore "presumed to be fraudulent and void" as against the creditors of Frank Calvi. (9) It is no answer to this presumption to say a fair consideration was in fact paid. There is still the presumption that the sale and purchase were in bad faith, and therefore fraudulent and void. This arises from the failure to make inquiry. There is no presumption in favor of George that he would have been misinformed. The testimony of George Calvi fails to rebut this presumption of bad faith. He admits enough to show that the burden was on him to inquire fully as to the purpose of Frank in making the sale and as to his indebtedness. Frank's statement, if made, that he intended to go into business in New York, did not excuse want of full and explicit inquiry. Neither does it show that George was not aiding Frank to dispose of his property, convert it into money, and go away leaving his creditors unpaid. His unnecessarily demanding his money, if Frank owed him any, shows he had no confidence in his financial ability or honesty, but tends to show he distrusted him and suspected his motives in going away. I find, however, that George Calvi stated to Mr. Bowne a few days later that he, George, made no inquiry whether the goods he purchased were paid for. (10) The very next day Horace Infusino, a former employé of Frank Calvi, a young Italian 20 years of age, who had known Frank in Italy and who had been in the employ of Frank, appeared at the store in Delhi for the reason he had been sent for by Frank Calvi. He had been there a few days before, and had, he says, offered $650 or $675, all the money he had, for the stock in fun, but Frank wanted $1,500. If, as he stated at one time in his testimony, this took place a few days before he purchased, Frank offered him the entire stock worth $2,250 to $2,500 for $1,500. Later he said this offer was made the day before he purchased. If so, he made a very speedy purchase. In any event, during the night he borrowed $400 of Frank's shoemaker, who had, he says, more than that sum in his pocket before he knew Frank would take less than $1,500 so as to purchase the stock (this made $1,075), and the next day offered $1,000 without examining the goods or bills therefor, except as he saw some of the goods on the shelves, and Frank at once accepted. It would seem he knew that $1,000 would take the stock and household furniture, all that Frank had. Of course, he knew Frank Calvi was going away. He made no inquiry as to creditors, or as to why Frank was selling out. The most of the goods were in a back room and unpacked. Then they went to the law office of Mr. Hewitt, where a bill of sale was drawn and $1,000 in bills paid over. Mr. Hewitt, and his clerk corroborates him, says that he asked Frank Calvi, " 'Mr. Calvi, are you owing any parties?' and he said, 'Yes, a party in Binghamton $25 or thereabouts.' Then I asked him when he was going to pay it, and he said, 'I am going there to-morrow morning and pay him.' " This was far from a full and explicit inquiry as to the names and addresses of each and all of the creditors of Frank Calvi. It was an evasive reply on the part of Frank Calvi. It was not a statement that he did not owe others. Of course, Mr. Hewitt understood it as a denial that he owed any debt other than that one.

But Mr. Hewitt was not employed by Infusino, and was not guarding his interests. It seems to me that this falls far short of overcoming the presumption of fraud raised by the statute quoted, especially when taken in connection with the other circumstances attending the entire transaction. To accept such a question as a "full and explicit inquiry," or such an answer as a sweeping assertion that he owed one debt and one only, would hardly sustain the integrity of the statute. If that had occurred in court and that question had been asked and that answer made by Frank Calvi, could he be indicted and convicted of perjury, it appearing that he owes many creditors and many thousands of dollars? It is immaterial that Frank Calvi or Horace Infusino did not know the statute quoted. The law arbitrarily presumes that they did know the law, at least so far as to raise the presumption of fraud against them both, and imposes the burden of showing affirmatively there was no fraud; that is, knowledge, express or implied, that Frank Calvi intended to cheat or defraud his creditors. Infusino went into possession that night, and to his knowledge in the night Frank Calvi packed up, and at 7 or 7:30 the next morning left the town with his family, and has not been seen or heard of since.

Why such haste in the sale? Infusino says the whole transaction was completed in an hour, and that he had not been in the store before he made the purchase. Why such haste to go away? Why was Infusino so acquiescent? Was or was not he a party to this departure in fraud of creditors? Again, did he examine the bills before he purchased and paid his money or afterwards? What is reasonable and probable? Again, while Infusino says he was inquiring for a business to purchase, he also said:

"Q. Who first mentioned buying the business or selling out? A. I did. Q. You asked him? A. I asked him just for fooling. I didn't want to buy his business."

He also stated more than once that up to the time they returned to the store after having been to Hewitt's office he did not ask Calvi anything about what bills he owed. He concedes he made no estimate of the value of what he bought, and did not open the boxes so as to know what he was getting.

Now, Mr. Bowne says that, when he went to the Calvi store and found Infusino in possession—

"I asked Mr. Infusino where Mr. Calvi was, and he said he had gone to New York. I then asked him if he had bought the goods in the store, and he said he had. I then asked him if he knew whether the goods were paid for or not, and he said he did not. I asked him if he had asked Calvi that question, and he said 'No.' I then asked him to let me see the goods in the back room, and he refused."

This is utterly inconsistent with the story of Infusino. I know of no reason for discrediting Mr. Bowne. If Infusino had made an honest purchase, why should he refuse to let Mr. Bowne see the goods? Mr. Bowne also says:

"I asked him (Infusino) regarding Calvi's shipping goods away. I asked him if he knew where they went, and he said a whole truck load went to Andes; and I asked him the number of cases on that truck load, and he couldn't remember; he said 30 or 40."

Infusino denied knowledge of any sales to other parties.

When on a given state of facts, as here, a statute, or a positive rule of the common law, says that the presumption is that the transaction was fraudulent and void, that presumption can be overcome only by "clear and positive" or "plain and convincing evidence which satisfies the judicial mind beyond a reasonable controversy." The Josefa Segunda, 5 Wheat. 338, 5 L. Ed. 104; The Carlos F. Roses, 177 U. S. 655, 20 Sup. Ct. 803, 44 L. Ed. 929; The Sally Magee, 3 Wall. 451, 18 L. Ed. 197; The Benito Estenger, 176 U. S. 568, 20 Sup. Ct. 489, 44 L. Ed. 592; Parks v. Ross, 11 How. 362, 13 L. Ed. 730; Howland v. Blake, 97 U. S. 624, 24 L. Ed. 1027. See, also, Quock Ting v. United States, 140 U. S. 417, 420, 11 Sup. Ct. 733, 851, 35 L. Ed. 501.

I regret that I cannot concur with the special master in his conclusion that the burden of overcoming the presumption of bad faith was in fact sustained by George Calvi and Infusino. I think he failed to appreciate the necessity for the presentation of clear and convincing testimony or evidence that they acted in good faith, as well as that they paid a fair consideration. In fact, the general tenor of much of his opinion would indicate his impressions were that the burden was on the other party to prove fraud. True, fraud cannot be presumed; it must be proved. But this does not mean that the Legislature cannot make a rule of evidence and provide that on a given state of facts a presumption of fraud shall arise, or that a given transaction shall be presumed fraudulent and void. When that presumption does arise, it obtains and controls the case until overthrown, as stated, by clear and convincing proof. In this case the presumption that these sales were fraudulent and void was not only not overcome, but, on the contrary, in some respects the presumption was strengthened.

There will be new findings in accordance with this opinion, including one that the sales to George Calvi and Horace Infusino were and are fraudulent and void as to the creditors of the bankrupt, Frank Calvi, and an order accordingly.