## AMERICAN TRANSATLANTIC CO. v. UNITED STATES.

### No. 17639.

United States Court of Claims.
May 2, 1949.

James J. Lenihan, of Washington, D. C., and Edgar Allan Poe, of Baltimore, Md., for plaintiffs.

Donald B. MacGuineas, of Washington, D.C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

On January 6, 1930, there was introduced in the Senate of the United States a bill, Senate 3396, making a grant of $15,000,000 to the American Transatlantic Company, the plaintiff herein, for the injury sustained by it as a result of the alleged illegal seizure and condemnation as prizes of war, by Great Britain, of three ships owned by Transatlantic. The seizures took place in October and November, 1915. The full text of Senate 3396 appears in our finding No. 1. The asserted obligation of the United States to compensate for the British seizure was stated in the bill to be an arrangement effected by an exchange of notes between our Government and the British Government, dated May 19, 1927, Treaty Series 756, U. S. Government Printing Office, Washington 1927, by which exchange of notes, it is asserted in the bill, our Government became responsible to its nationals who had been wronged by Great Britain.

The Senate, by Senate Resolution 265, of May 22, 1930, referred Senate 3396 to this court for the action provided for in the Act of March 3, 1911, 36 Stat. 1135, 1138, the provisions of which are now found in Sections 1492 and 2509 of Title 28 of the United States Code Annotated which Title is the Judicial Code, as it was amended and re-enacted in 1948. By these sections it is provided that when either House of Congress shall refer a bill to this court, the court " * * * shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches,

facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

"The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

The court has performed its statutory function, and reports to the Senate its findings of the relevant facts in the case, and this opinion explaining why it has found the facts as it has, and why it has reached the conclusions which it has reached.

The important question of fact in the case is whether, at the time in October and November 1915 when the ships in question were seized by Great Britain, they were owned, in substance and reality, though not in form, by one Hugo Stinnes, a German, or were really the property of their formal owner, the plaintiff, an American corporation. The legal question in the case is whether, even if Hugo Stinnes was the real and substantial owner of the ships, Great Britain was justified, by international law, in seizing them, in view of the fact that they had American registry and flew the American flag.

Richard G. Wagner, an American-born resident of Milwaukee, Wisconsin, formed the plaintiff company in March 1915. His father, whose name was Wagenknecht, had come to America from Germany in 1853. He changed his name to Wagner. His son, Richard G. Wagner, prospered in a steel business, which he sold to advantage, and went into the beet sugar business, being president of three sugar companies. Wagner in 1913 suffered financial reverses, sold most of his stock in these companies, and ceased to be president of any of them. By the end of 1914 he was in debt and had pledged a life insurance policy to secure a note.

About December 4, 1914, Wagner received a cablegram from Copenhagen, Denmark, sent by the Copenhagen Coal and Coke Company, a Hugo Stinnes company, or by Albert Jensen, the resident manager of the company and Hugo Stinnes' agent in Denmark and the other Scandinavian countries. The wife of Hugo Stinnes was Wagner's first cousin. She was the daughter of one Wagenknecht, a brother of Wagner's father, who had come to the United States with Wagner's father but had later gone to Uruguay.

On December 31, 1914, Wagner sailed from New York, arriving at Rotterdam on January 10, 1915. He proceeded to Germany, visited his relatives, and then went to Copenhagen to confer with Jensen. Jensen had been buying commodities and ships with Stinnes' money, which was made available to him in a Copenhagen bank. The plaintiff says that, so far as the ships so purchased were concerned, Jensen, or certain Danish corporations owned by him, bought the ships for Jensen's ownership, the Stinnes money used for their purchase being loaned by Stinnes to Jensen. We defer the answer to this question.

Jensen was having difficulty obtaining permanent Danish registration on these newly acquired ships. Great Britain had learned that they were being bought with Stinnes' money, knew that Jensen was an agent of Stinnes, and made representations to and brought pressure upon the Danish Government to curb Jensen's activities. Jensen was admonished by his government, which later enacted a law making Danish registration subject to the discretion of the government.

Jensen was notified by Stinnes that Wagner was coming to see him in Copenhagen. Wagner came, and within a few days Wagner and Jensen had agreed that Wagner was to form an American corporation to which ships already bought and to be bought by Jensen with money advanced by Stinnes were to be transferred. The corporation's officers and directors were to be Americans, which would qualify its ships to obtain American registry and fly the American flag. Jensen was to own most of the stock of the corporation.

On January 29, 1915, Wagner gave Jensen a general power of attorney to act for him in Europe. Early in February 1915, the Danish Government brought criminal

834

proceedings against Jensen for attempting to smuggle copper out of Denmark into Germany, at the instigation of Hugo Stinnes. He was ultimately convicted and served 60 days in jail for the offense. His crime was not regarded as a dishonoring one and did not affect his citizenship or his standing in his business community. At about the time of the proceeding against Jensen, one Theodore Lahr, of Rotterdam, Holland, was requested by telegram to meet Wagner in Germany. Lahr had formerly been an agent of the Stinnes interests in Holland. He was not able to go, but a few days later a power of attorney, executed at Dusseldorf, Germany, was sent him by Wagner, authorizing him to purchase ships for Wagner. This power of attorney was later superseded by others executed by Wagner and the plaintiff company in the United States, reciting Wagner's American citizenship, and broadening the geographical area within which Lahr might act.

Wagner returned to the United States by way of Italy, reaching New York in March 1915. On March 22, 1915, the American Transatlantic Company, the plaintiff company, was organized under the laws of the State of Delaware. The first $1,000 put into the company was borrowed by Wagner. He sent several cablegrams to Jensen asking for $40,000 to be made available to him, and on April 15, Jensen made $40,000 available from freight money that he had in a New York bank. The money was paid into the company for 400 shares of its stock. An office was set up in New York.

On May 16, 1915, which was before Wagner had received notice that the title to any ships had been transferred to either himself or the plaintiff company, Wagner consulted the United States Commissioner of Navigation in the Department of Commerce with regard to securing American registry for the ships. Wagner later gave that official a list of the ships intended to be acquired. Publicity resulting from Jensen's conviction for attempted smuggling of copper out of Denmark into Germany, and the publication by "Lloyd's List" of the names of the ships which had been purchased by Jensen with money furnished

by Stinnes, had come to the attention of the Commissioner of Navigation. Because Jensen was to have an interest in the plaintiff company and in the ships, the Commissioner of Navigation would not grant American registry, nor advise the American consuls in Norway, Denmark and Holland, where the ships were then located, to issue provisional registry. The plaintiff says that this refusal of the Commissioner of Navigation was without justification; that since the plaintiff company and its officers and directors were Americans, the plaintiff was entitled to have its ships registered, even if its principal stockholder had been Stinnes, a citizen of Germany, a belligerent in a war in which we were not then involved. The plaintiff may be right on this point, but it is not necessary for us to decide it. Because of the delay in securing American registry on account of Jensen's interest in the ships, Wagner, in June 1915, advised the Commissioner of Navigation that he had decided to eliminate Jensen from the plaintiff company by paying cash for the ships and not issuing any stock to Jensen. Wagner, in June 1915, wrote Jensen that because of the attitude of United States officials it would be necessary to eliminate Jensen from the ownership of stock in the plaintiff corporation.

Wagner signed notes dated June 7, 1915, payable in installments over five years, for the $2,654,850 which Jensen had paid for the eleven ships intended to be acquired by the plaintiff company. Because of the substitution of a cheaper ship for one of the ships intended to be acquired, the amount of the notes was $105,200 in excess of the amount Jensen had paid for the ships, which were later transferred to the plaintiff company. On July 12, 1915, Wagner mailed the notes to Jensen. Jensen regarded the notes as a subterfuge employed by Wagner to obtain American registry, and as not really eliminating him from his interest in the ships.

The Department of Commerce and its Commissioner of Navigation still failed to grant the desired American registry. On July 6, 1915, a bank at Malmo, Sweden, sent $725,000 to Wagner, on July 7 it sent $54,628.63, and July 19 it sent $556,818.18. These remittances were, in form, at the

request of Eduard Wagenknecht, who was a brother-in-law of Hugo Stinnes, and a cousin of Wagner. In fact they were made at the direction of Jensen and were paid for by him. This money, received by Wagner in July and August, 1915, was, by various remittances between August 17 and October 25, 1915, sent, except for a small part of it, to the plaintiff company's office at Copenhagen, from which $1,179,-657.78 was paid either to Jensen and by him into Hugo Stinnes' bank account or directly into that account. The account named was recorded by the plaintiff's New York office as a payment of principal and interest on Wagner's notes to Jensen.

On June 28, 1915, before American registry had been obtained for the ships, the French seized the Saginaw, one of the ships intended for the plaintiff's fleet, which had been sold to the plaintiff company and had given up its former national registry but had not yet received its American registry. The French Government had been advised by the American Government that the sale to the plaintiff was not a genuine transfer. Wagner protested the refusal of the Department of Commerce to register this and the other ships and to give them protection. After consulting with the Department of State, the Department of Commerce decided that the plaintiff was entitled to American registry for its ships, but advised Wagner that if the ships were captured by belligerents, prize courts might conclude that their ownership was, in reality, German. American registry was thereafter granted for eleven ships, including the Saginaw, which was in the hands of the French. The French prize court, however, refused to release the ship because of the statement of the American Government at the time of seizure that the ship was owned by German interests.

The ships directly in question here were the Hocking, the Kankakee, and the Genesee, which were three of the eleven ships acquired by the plaintiff. The Hocking obtained permanent American registration on October 27, 1915. She was chartered to W. R. Grace and Co., and, on October 28, left New York for Norfolk, Virginia, to load coal. She was seized on that day by a British warship and delivered to a British prize court at Halifax, Nova Scotia. The proceedings were transferred to the High Court of Justice, Probate, Divorce and Admiralty Division, in London.

The Kankakee and the Genesee, after American registry, were chartered to W. R. Grace and Co., and were seized by British warships, the former in October and the latter in November 1915, while transporting coal from American to South American ports. These ships were, like the Hocking, proceeded against as British prizes of war in the High Court of Justice in London. Plaintiff's counsel entered appearances in that court in 1916 and litigated the legality of the seizure of the three ships. The Government of the United States made extensive efforts to have the British Government release the ships. Negotiations were carried on with the British authorities to settle the case by the sale of the plaintiff's entire fleet of ships to British interests, but, at about the time that a price agreeable to the plaintiff and the British, some $8,000,000, had been arrived at, our Government refused to allow the ships to be transferred from American registry. At about the same time that these negotiations were in process, the British Government settled with Jensen by releasing two ships of Jensen-controlled Danish companies which the British had seized, in consideration of Jensen's sale to interests friendly to the British of these two ships and of a third and larger ship which he controlled. The British High Court of Justice decided on February 4, 1918, that the three ships registered in the plaintiff's name were lawful prizes because, it held, they belonged to Stinnes. Upon appeal, the Privy Council affirmed the judgment on July 23, 1920.

Up to the time of the seizure of the three ships by the British in the autumn of 1915, no money had been invested in the stock of the plaintiff company except the original $1,000 borrowed by Wagner and the approximately $2,500,000 furnished by Stinnes, through Jensen, for the purchase of the company's eleven ships. In an attempt to create an appearance of American ownership of the ships, Wagner sought to induce Americans to become stockholders. A total of ten shares of the $100 per share

stock was placed by Wagner in the hands of nine friends of Wagner, and affidavits were taken from them stating that they were stockholders, but not stating how much stock they owned. Other shares were given out by him, to be paid for only out of dividends. When a dividend of $1,623,-349.70 was declared in 1917 and paid in 1918, some of these stockholders paid the dividends back to Wagner, by returning his check or sending him one for the same amount, or by sending him Liberty bonds.

The plaintiff's remaining seven ships, after the seizures by the French and the British, operated profitably. The German Central Purchasing Agency, a branch of which was maintained in New York by the German Government, at first used some of the ships to transport commodities purchased or arranged for by the agency in this country, to Germany, directly or indirectly. Dr. Albert, the German in charge of the New York branch, regarded the plaintiff's fleet as "Stinnes" ships and so referred to them in his communications with Berlin, as did other Germans acting for the purchasing agency. A complicated plan for blockade running, with one of the ships, the Maumee, whereby she was to be seized by a German warship and, after her cargo had been taken by the Germans, released, which plan was developed by Dr. Albert and the Central Purchasing agency in Berlin, was vetoed by Stinnes because the device was rather transparent, and, he thought, it might adversely affect the possibility of obtaining the release of the three ships held by the British. Stinnes ordered the removal of rubber from the cargo of another of the ships, which had been loaded in New York and was destined for Germany. The rubber was removed.

After our entry into the war and the enactment of the Trading with the Enemy Act of October 6, 1917, 50 U.S.C.A.Appendix, § 1 et seq., the United States Alien Property Custodian conducted an investigation of the plaintiff company. Wagner falsely stated to that official, on August 1, 1918, that the company had received a large amount of American money from the sale of its stock. On the next day he retracted this statement and said that his cousin Wagenknecht had sent him the

$1,300,000 for the purpose of its being sent back to Europe to take up Jensen's interest in the ships. The Alien Property Custodian seized the stock of the plaintiff company, and of a wholly owned subsidiary, the Foreign Transport and Mercantile Corporation, on the ground that the real interest in the stock was owned by a German. In the meantime, after our entry into the war, the seven remaining ships of the plaintiff's fleet were, as were nearly all ocean-going vessels in the United States, taken over by the United States Shipping Board Emergency Fleet Corporation.

Wagner and his son, J. P. Wagner, brought suit as stockholders against the Alien Property Custodian in the United States District Court for the Eastern District of New York, demanding the return of the seized property. At about the same time, Lawson and other stockholders brought a similar suit in the Eastern District of Wisconsin. The New York case never proceeded to the taking of evidence. In the Wisconsin case the court ordered the taking of evidence in Copenhagen and London, where voluminous evidence was taken in 1920 and 1921. By stipulation of the parties, the evidence taken in the Wisconsin case, transcripts of the statements made to the Alien Property Custodian in 1918, during his investigation looking toward seizure of the plaintiff's property, and testimony given before a grand jury in New York which was investigating Wagner and others in 1920, are in evidence in this case. Wagner did not testify in the Wisconsin case.

In the summer of 1921 Jensen came to the United States and conferred with Thomas W. Miller, the then Alien Property Custodian, with regard to the return of the property. His asserted interest was that Wagner still owed him $1,500,000 plus interest on the notes which Wagner had sent him in 1915, and that, as a creditor of Wagner, he had a right to have the property returned to Wagner, so that Wagner could pay him what he owed him. The Alien Property Custodian released $360,-000 to Jensen, of which he used some $160,-000 to buy up, at 20 cents on the dollar, the stock of the company which was in the hands of persons other than Wagner, and

$200,000 as a deposit to secure these stockholders against tax and other liabilities which might be asserted against them. Some of these stockholders turned over to Wagner the money paid them by Jensen for their stock. Jensen also took from Wagner and two of his sons assignments of their stock, to be held by Jensen as collateral for the debt of Wagner to Jensen. Jensen then dismissed the two pending suits against the Alien Property Custodian, and filed a claim with the Custodian for the release of the assets held by him.

After an investigation in Germany by a Special Assistant to the Attorney General, whose report is referred to in finding 22, the Acting Attorney General of the United States and, we suppose, the Alien Property Custodian took the position that Stinnes had no interest in the ships. On June 16, 1923, the Acting Attorney General recommended to President Harding that the property be released to Jensen and it was so released on June 19, 1923.

The exchange of diplomatic notes referred to in Senate 3396 waived the claims of American nationals against Great Britain, and the bill proposed that the United States should undertake the asserted liability of Great Britain to the plaintiff corporation. Unless the three ships seized were owned in fact and reality and not merely in form by the plaintiff, American Transatlantic Company, an American national, and not by Albert Jensen, a Danish national, nor Hugo Stinnes, a German national, the waiver included in the exchange of notes did not apply to a claim for the seizure of the ships. The exchange of notes was not a waiver of any claim, legal or diplomatic, which Jensen, a Danish national, or his government, might have had against Great Britain, nor of any claim of Stinnes or his government.

In order to reach the conclusion that the ships were owned by the plaintiff, an American national, we would have to find (1) that the money advanced by Stinnes to Jensen with which the ships were purchased was loaned by Stinnes to Jensen, and became Jensen's money, and (2) that the ownership of Jensen of the ships, whether for himself or for Stinnes, was eliminated when Wagner sent the promissory notes

to Jensen in 1915. We are unable to reach either of these two conclusions, both of which, as we have said, would be necessary to a decision favorable to the plaintiff.

The only part of the evidence in the case which might be regarded as complete and satisfactory is the evidence concerning the conduct of Wagner in this country. That evidence shows a succession of misrepresentations and subterfuges resorted to for the purpose of deceiving the British authorities and our own, for the purpose of getting the fleet of ships into American registry, with its advantages, and, later of getting the ships released from British seizure. We pass no moral judgment on Wagner's conduct in this regard. He was obviously strongly pro-German, as many other people, including the American shipping officials with whom he dealt, were strongly pro-Ally, though the United States was neutral. We stress Wagner's misrepresentations and subterfuges, not for the purpose of denying that "all is fair in love and war," but only to show why we place no reliance whatever upon the form and appearance into which Wagner's transactions were cast. We have the same impression of Jensen, the Stinnes agent, willing, at Stinnes' behest, to risk violating the laws of his own country and going to jail for it. We are obliged, therefore, to look through the appearance of things and try to determine what the realities were.

We are asked to believe that Stinnes, an enormously rich and successful German businessman, loaned some two and one-half million dollars to Jensen, without security, to enable Jensen to engage in the highly speculative business of buying, selling, and operating ships. Jensen says that, at the time, Stinnes was dubious, though Jensen was optimistic, about the soundness of investment in ships. Jensen's books seem to show that he had very little money, and it is incredible that Stinnes would have risked such a huge sum in a venture where it might well have been lost, and where his only gain, if the venture succeeded, would have been ordinary interest.

The plaintiff says that a considerable part of the money advanced to Jensen for the purchase of the ships was loaned not

by Stinnes but by the firm of Robert Sloman, Jr., of Hamburg. Jensen said that a representative of the Sloman firm requested the privilege of lending him money, having heard that Stinnes was doing so. Jensen's regular account books do not mention the Sloman affair. A separate and unusual book contains a Sloman account. Repayments of the Sloman loan were made to Stinnes' bank account in Copenhagen. Jensen says that was because Stinnes had better facilities for transmitting money into Germany. Whatever part the Sloman firm may have had in the affair was, we are satisfied, that of a transmission agent and blind for Stinnes, when the British were publishing to the world that Jensen was operating with Stinnes' money. We therefore treat the Stinnes money and the Sloman money as all coming from Stinnes.

The plaintiff urges, as an explanation of the apparently irrational conduct of Stinnes in lending this money to Jensen, that Stinnes desired to get some of his money out of Germany. This desire would not have been fulfilled at all by putting it out upon an account current, repayable and expected to be repaid, and, the plaintiff says, actually repaid into Germany within a short time and while the war was still going on. With the wide international connections that Stinnes had, there were surely plenty of opportunities for the placing of Stinnes' money in neutral countries for the duration of the war, without exposing it to the perils of enemy action, of the sea, and of a relatively impecunious debtor, and with no chance of gain, if these perils should be survived, except ordinary interest.

Our conclusion as to the asserted Stinnes-Jensen loan is that it was not a loan, but an advance by Stinnes to Jensen as his agent, to buy and operate ships in his name, or in the name of some other neutral person or corporation, for the benefit of Stinnes. But, the plaintiff says, Jensen paid the money back to Stinnes with the asserted agreed interest. The books show such a repayment, and the Alien Property Custodian and the Acting Attorney General in 1923 seem to have regarded that showing as conclusive. We remember that the plaintiff's books also show that Wagner promptly paid $1,300,000 on his notes to Jensen, and maintained for years that he had raised the money in this country. In fact, he had it from Jensen, in the name of Stinnes' brother-in-law Wagenknecht, and it went back to Stinnes, through Jensen. It was, we think, a "wash" transaction, which, like nearly everything that was done in the Stinnes-Jensen-Wagner triangle, was done to create a false appearance. We have no confidence in the Jensen-Stinnes accounts as they were kept in Copenhagen. We do not know what the Stinnes accounts in Germany may have shown, as they are not in evidence. Our conclusion is that the ships bought by Jensen or by the plaintiff company with money advanced by Stinnes, through Jensen, belonged to Stinnes.

The purported ownership of the ships acquired by the plaintiff from Jensen or from other foreign owners with Stinnes' money was not genuine ownership. Whether the ships, when originally acquired, belonged to Jensen, or, as we find, to Stinnes, their purported transfer to the plaintiff corporation, in consideration of the promissory notes of Wagner, who had no money at all, without any sort of security, is even more incredible than the alleged loan from Stinnes to Jensen. The risk that the ships would be lost was great. The very purpose of transferring the ships to America was to diminish that risk. Four of the eleven ships were, in fact, lost within a few months. No one would sell two and one-half million dollars worth of ships at cost to a man who had no money, and no resources whatever, taking his notes for them, thereby foregoing any possible chance of gain if the highly speculative venture should succeed, but carrying the certainty of loss if the venture should fail. Jensen himself said that the purported sale was a subterfuge, and we have no doubt that it was.

We have concluded that the three ships seized by Great Britain as prizes of war belonged, at the time of seizure and condemnation, to Hugo Stinnes, a German national. If they did not belong to Stinnes, they belonged to Albert Jensen, a Danish national. In either case, the exchange of notes between our Government and Great

Britain, referred to in Senate 3396, quoted in our finding 1, which exchange of notes waived the claims of United States nationals against Great Britain, has no relation to the claim of the plaintiff, the American Transatlantic Company, since it did not, in reality, own the ships, but only held the legal title to them as a blind for their true owner, who was not a national of the United States.

 In view of what we have said, it is not necessary to decide whether, as the plaintiff urges, the mere fact that a ship has obtained registry in a neutral nation, and is therefore entitled to fly the flag of that nation, is conclusive in a prize court and makes irrelevant any showing that the real and beneficial ownership of the ship is in an enemy country or national. Our impression is, however, that the plaintiff's contention is not correct. It would be unusual if, although courts for all other purposes look through corporate fictions and trust devices to ascertain the true status of affairs, a prize court may not do so. The rule of international law seems to be that if a ship flies an enemy flag, it will not be permitted to show, in a prize court, that its true ownership was neutral, but that the fact that it flies a neutral. flag does not prevent the seizing nation from proving that its true ownership was in the enemy. There seems to be no American decision bearing directly on the question. In The Benito Estenger, 176 U.S. 568, 20 S.Ct. 489, 44 L.Ed. 592, a ship of British registry and flying the British flag was condemned in prize when it was proved that the beneficial ownership was Spanish. The court, however, relied on the rule that a transfer from enemy to neutral ownership, flagrante bello, such as had occurred in that case, was presumptively ungenuine. The English decisions, which have to a large extent made the international law on the subject of ships, are clear on the point. The Fortuna, 1 Dods. 81, 86–87, 165 Eng.Rep. 1240, 1242, decided by Sir William Scott, afterward Lord Stowell; The St. Tudno [1916], P. 291; The Proton [1918 A.C. 578]. Mr. Justice Story, in his Notes on the Principles and Practice of Prize Courts, Pratt's ed., 1854, p. 62, quotes with approval the language of Sir William Scott in the Fortuna, supra. We are cited to no decision to the contrary.

 The conclusion which we report to the Senate then is that the three ships nominally belonging to the plaintiff corporation were actually owned by Hugo Stinnes, a German national, and, if not by him, then by Albert Jensen, a Danish national, and that the exchange of notes between the United States and Great Britain, referred to in Senate 3396, did not waive any claim against Great Britain which was actually owned by the American Transatlantic Company. We observe further that it is our impression that the seizure and condemnation by Great Britain of the three ships in question was not in violation of the rules of international law. In our opinion the American Transatlantic Company does not, on the basis of the evidence presented to us, have any legal or equitable claim against the United States.

The Counterclaim of the United States.

 The Government filed a counterclaim alleging, and the evidence shows that United States income and excess profits taxes in the amount of $1,282,977.48 for the years 1918, 1919, and 1920 were assessed against the American Transatlantic Company and have not been paid. The collection of these taxes has, apparently, been barred by the statute of limitations. Internal Revenue Code, Sec. 276(c), 26 U.S.C.A. § 276(c).

It is ordered that the special findings of fact, conclusions of law and the foregoing opinion of the court be transmitted to the Senate, in accordance with the Act of March 3, 1911, 36 Stat. 1087, as amended by the Act of June 25, 1948, 28 U.S.C.A. §§ 1492, 2509, Judicial Code, Sections 1492 and 2509.

JONES, Chief Judge, and HOWELL and LITTLETON, Judges, concur.

WHITAKER, Judge, took no part in the decision of this case.